# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued February 15, 2010        Decided July 13, 2010

No. 09-5333

MOHAMMED AL-ADAHI, DETAINEE, CAMP DELTA,
GUANTANAMO BAY NAVAL STATION, GUANTANAMO BAY,
CUBA AND MIRIAM ALI ABDULLAH AL-HAJ, NEXT FRIEND OF
MOHAMMED AL-ADAHI,
APPELLEES/CROSS-APPELLANTS

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLANTS/CROSS-APPELLEES

---

Consolidated with 09-5339

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:05-cv-00280-GK)

---

*Anne Murphy*, Attorney, U.S. Department of Justice, argued
the cause for appellants/cross-appellees. With her on the briefs
were *Douglas N. Letter* and *Robert M. Loeb*, Attorneys.

*John A. Chandler* argued the cause for appellees/cross-appellants. With him on the briefs were *Patricia L. Maher* and *Richard G. Murphy, Jr. Gregory S. Smith* entered an appearance.

Before: HENDERSON and KAVANAUGH, *Circuit Judges,* and RANDOLPH, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge:* In the summer of 2001, a thirty-nine year-old Yemeni security guard took a six-month leave of absence from his job to move to Afghanistan. Leaving his wife and his two children, he stayed at the Kandahar home of his brother-in-law, a close associate of Usama bin Laden. Twice he met personally with bin Laden. From Kandahar he moved into a guesthouse used as a staging area for al-Qaida recruits. He then attended al-Qaida's Al Farouq training camp, where many of the September 11th terrorists had trained. He traveled between Kabul, Khost, and Kandahar while American forces were launching attacks in Afghanistan. Among other explanations for his movements, he claimed that he had decided to take a vacation. After sustaining injuries requiring his hospitalization, he crossed the Pakistani border on a bus carrying wounded Arab and Pakistani fighters. This man, Mohammed Al-Adahi, who is now a detainee at Guantanamo Bay Naval Base, admits all of this but insists he was not a part of al-Qaida and never fought against the United States. Others identified him as a ███████████████████████████ ███████████ On his petition for a writ of habeas corpus, the district court ordered him released. We reverse.

Pakistani authorities captured Al-Adahi in late 2001. In 2004, a Combatant Status Review Tribunal determined, by a preponderance of evidence, that he was part of al-Qaida. Al-

Adahi filed his habeas corpus petition in 2005. In 2008 the Supreme Court ruled that despite statutes depriving the federal courts of jurisdiction to hear habeas petitions from Guantanamo detainees, the Suspension Clause of the Constitution at least preserved the writ as it existed in 1789. *Boumediene v. Bush*, 553 U.S. 723 (2008).

Al-Adahi's habeas petition presented the question whether he was part of al-Qaida and therefore justifiably detained under the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001). The district court considered the government's two factual returns and Al-Adahi's three traverses, in addition to a substantial record that included intelligence reports, interrogation summaries, expert declarations, and Al-Adahi's direct and cross-examination (transmitted live from Guantanamo). The court found "no reliable evidence in the record that Petitioner was a member of al-Qaida" and ruled that he should be released. *Al-Adahi v. Obama*, No. 05-280, Mem. Op. at 41, 2009 WL 2584685 (D.D.C. Aug. 21, 2009) ("Mem. Op."). The government brought this appeal and Al-Adahi cross-appealed.

The Authorization for Use of Military Force empowers the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Pub. L. No. 107-40, § 2(a). "[A]ll necessary and appropriate force" includes the power to capture and detain those described in the congressional authorization. *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004). The government may therefore hold at Guantanamo and elsewhere those individuals who are "part of" al-Qaida, the Taliban, or associated forces.

*See Awad v. Obama*, No. 09-5351, slip op. at 18 (D.C. Cir. June 2, 2010); *Al-Bihani v. Obama*, 590 F.3d 866, 872, 874-75 (D.C. Cir. 2010).

Whether Al-Adahi fit that description was and is the ultimate issue. The obvious preliminary question is what sort of factual showing does the government, or the detainee, have to make? In this court the question is open. *Al-Bihani* held that the government does not have to prove the legality of detention "beyond a reasonable doubt" or by "clear and convincing evidence." *See* 590 F.3d at 878; *see also Awad*, slip op. at 17-18. *Al-Bihani* also decided that the preponderance-of-the-evidence standard is constitutionally permissible. 590 F.3d at 878. But we have yet to decide whether that standard is required. *Id.* at 878 n.4; *see also Awad*, slip op. at 18 n.2.

The district judge in this case adopted the preponderance standard. Mem. Op. at 5. Other district judges in our circuit have done the same. *See, e.g., Awad*, slip op. at 8. Their rationale is unstated. After *Boumediene*, the district judges met in executive session and decided to coordinate proceedings in Guantanamo habeas cases. *See In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 309, 310 (D.D.C. 2008). On November 6, 2008, the coordinating judge issued a Case Management Order. *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442, 2008 WL 4858241 (D.D.C. Nov. 6, 2008). The Order stated, among other things, that the government should bear the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful. Order at 4. In support, the Order cited *Boumediene*. But *Boumediene* held only that the "extent of the showing required of the Government in these cases is a matter to be determined." 128 S. Ct. 2229, 2271.[1]

---

[1] Earlier in the opinion the Court seemed to put the burden on the detainee: the Court stated that "the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is

*Boumediene* also held that in determining the scope of the writ, "the analysis may [must?] begin with precedents as of 1789, for the Court has said that 'at the absolute minimum' the Clause protects the writ as it existed when the Constitution was drafted and ratified." *Id.* at 2248 (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)). Yet we are aware of no precedents in which eighteenth century English courts adopted a preponderance standard. Even in later statutory habeas cases in this country, that standard was not the norm. For years, in habeas proceedings contesting orders of deportation, the government had to produce only "some evidence to support the order." *St. Cyr*, 533 U.S. at 306; *Bakhtriger v. Elwood*, 360 F.3d 414, 421 & n.7 (3d Cir. 2004). In such cases courts did not otherwise "review factual determinations made by the Executive." *St. Cyr*, 533 U.S. at 306 (citing *Ekiu v. United States*, 142 U.S. 651, 659 (1892)). In habeas petitions challenging selective service decisions, the government also had the minimal burden of providing "some evidence" to support the decision. *See Eagles v. U.S. ex rel. Sanders*, 329 U.S. 304, 311-12 (1946). Habeas petitions contesting courts martial required the government to show only that the military prisoner had received, in the military tribunal, "full and fair consideration" of the allegations in his habeas petition. *See Burns v. Wilson*, 346 U.S. 137, 142 (1953). And in response to habeas petitions brought after an individual's arrest, the government had to show only that it had probable cause for the arrest. *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 125, 130 (1807).

After oral argument, we ordered the parties to file supplemental briefs discussing "what factual showing" (if any) the government must make to justify detaining Al-Adahi. The

---

being held pursuant to 'the erroneous application or interpretation' of relevant law." 128 S. Ct. at 2266 (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)).

supplemental briefs we received were not exactly illuminating. The government stated that "in the circumstances currently presented in this Guantanamo habeas litigation," a preponderance standard is "appropriate," Supp. Br. of Appellants at 1, although "a different and more deferential standard may be appropriate in other cases or contexts," Supp. Reply Br. of Appellants at 2.[2] Al-Adahi readily agreed with the government that the preponderance standard should govern his case. Supp. Br. of Appellee at 2-3. We are thus left with no adversary presentation on an important question affecting many pending cases in this court and in the district court. Although we doubt, for the reasons stated above, that the Suspension Clause requires the use of the preponderance standard, we will not decide the question in this case. As we did in *Al-Bihani*, we will assume *arguendo* that the government must show by a preponderance of the evidence that Al-Adahi was part of al-Qaida. 590 F.3d at 878 & n.4.

The district court divided the government's evidence into five categories in rough chronological order: Al-Adahi's trip to Afghanistan; his meetings with bin Laden; his stay in an al-Qaida guesthouse; his military training at Al Farouq; and his other, later activities in Afghanistan. Mem. Op. at 13. We will generally follow the court's organization, but before we get to the specifics we need to mention an error that affects much of

---

[2] The government added that "the same [standard of review] may not apply in other cases or contexts involving review of the lawfulness of military detention." Supp. Br. of Appellants at 13-14. The government never explained why there should be a difference. The government also stated that although it was "not here seeking deference to a military tribunal, this Court should make clear that deference to military and intelligence judgments is nonetheless still essential in evaluating the evidence in these cases." *Id.* at 19. Again the government failed to explain why it was not seeking deference to the judgment of the Combatant Status Review Tribunal in this case.

the district court's evaluation of the evidence. The error stems from the court's failure to appreciate conditional probability analysis. *United States v. Prandy-Binett*, 5 F.3d 558, 558-60 (D.C. Cir. 1993) (denying rehearing).

"Many mundane mistakes in reasoning can be traced to a shaky grasp of the notion of conditional probability." JOHN ALLEN PAULOS, INNUMERACY: MATHEMATICAL ILLITERACY AND ITS CONSEQUENCES 63 (1988). The key consideration is that although some events are independent (coin flips, for example), other events are dependent: "the occurrence of one of them makes the occurrence of the other more or less likely . . . ." JOHN ALLEN PAULOS, BEYOND NUMERACY: RUMINATIONS OF A NUMBERS MAN 189 (1991). Dr. Paulos gives this example: "the probability that a person chosen at random from the phone book is over 250 pounds is quite small. However, if it's known that the person chosen is over six feet four inches tall, then the conditional probability that he or she also weighs more than 250 pounds is considerably higher." INNUMERACY 63.

Those who do not take into account conditional probability are prone to making mistakes in judging evidence. They may think that if a particular fact does not itself prove the ultimate proposition (*e.g.*, whether the detainee was part of al-Qaida), the fact may be tossed aside and the next fact may be evaluated as if the first did not exist. *Prandy-Binett*, 5 F.3d at 559-60. This is precisely how the district court proceeded in this case: Al-Adahi's ties to bin Laden "cannot prove" he was part of Al-Qaida and this evidence therefore "must not distract the Court." Mem. Op. at 18. The fact that Al-Adahi stayed in an al-Qaida guesthouse "is not in itself sufficient to justify detention." *Id.* at 20. Al-Adahi's attendance at an al-Qaida training camp "is not sufficient to carry the Government's burden of showing that he was a part" of al-Qaida. *Id.* at 25. And so on. The government is right: the district court wrongly "required each piece of the

government's evidence to bear weight without regard to all (or indeed any) other evidence in the case. This was a fundamental mistake that infected the court's entire analysis." Br. of Appellants at 42.

Having tossed aside the government's evidence, one piece at a time, the court came to the manifestly incorrect – indeed startling – conclusion that "there is no reliable evidence in the record that Petitioner was a member of al-Qaida and/or the Taliban." Mem. Op. at 41. When the evidence is properly considered, it becomes clear that Al-Adahi was – at the very least – more likely than not a part of al-Qaida. And that is all the government had to show in order to satisfy the preponderance standard. *Awad*, slip op. at 17-18; *see Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993) (citing *In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring)).

Al-Adahi served in the Yemeni army for two years and was later employed as a security guard at the Yemeni state oil company. In July 2001 he took a six-month leave of absence from his job and left his wife and his two children to travel with his sister Amani to Afghanistan (by way of Pakistan). Amani had entered into an arranged marriage with Riyadh Abd Al-Aziz Almujahid, a Yemeni citizen then residing in Kandahar.

Riyadh was affiliated with al-Qaida. He arranged for Amani's and Al-Adahi's trip to Afghanistan. He helped them obtain passports from the passport agency in their hometown of Ta'iz. He then sent Al-Adahi to the Yemeni capital city of Sana'a. Al-Adahi was instructed to wear a red jacket and wait outside a specified building for a man he did not know. This man, Ali Yayha, recognized Al-Adahi and gave him two plane tickets and travel money. Yayha also arranged for Al-Adahi and Amani to obtain visas. The government presented evidence that

al-Qaida paid for Al-Adahi's and Amani's trip. Al-Adahi admitted that the sort of arrangements that Riyadh made for him and his sister were the same as those al-Qaida used for bringing jihadist recruits to Afghanistan.[3] And he described how Riyadh had obtained Al-Adahi's travel funds from "the Saudi who handled the money" for al-Qaida in Kandahar. That Al-Adahi was an al-Qaida recruit is also supported by a witness's statement – not addressed by the district court – that Al-Adahi was a ██████████████████████████████████████ ███████████

Riyadh was "from mujahidin" – that is, those who fought against the Russians and in the Afghan civil war. Many mujahidin frequented the guesthouse Riyadh operated in Kandahar. Al-Adahi stayed at Riyadh's house, located in the same compound. Al-Adahi told interrogators that Riyadh "had achieved a very high status" in al-Qaida.[4] Like Al-Adahi, Riyadh was described to interrogators as a ████████████ ███████████████████████████████████And Al-Adahi admitted that Riyadh's compound was very close to the compound of Mullah Omar, the leader of the Taliban.

Bin Laden hosted the male-only celebration of Riyadh's marriage to Al-Adahi's sister. Bin Laden held the celebration at his compound, which Al-Adahi described as "surrounded by a concrete fence further secured by a large metal gate." Inside the compound, a group of armed guards "draped in munitions belts,

---

[3] Al-Adahi insisted that this was not the impetus for his own travel. He told interrogators that his purpose was to accompany Amani as she traveled to meet her husband.

[4] Al-Adahi told interrogators that Riyadh was a bin Laden bodyguard. But during the habeas proceedings he said he "doubt[ed]" this was true. Riyadh's brother, Da'ood Al-Ta'zai, was a member of bin Laden's security detail.

10

grenades, and Kalashnikov rifles" welcomed the wedding guests. At the party, bin Laden gave a speech congratulating Riyadh. Al-Adahi and bin Laden were introduced and sat next to each other during the meal.

Several days later, bin Laden summoned Al-Adahi for another meeting. According to Al-Adahi, at his meeting bin Laden asked him about people he was connected with in Yemen – some of whom were involved in jihad. (The events following the meeting, including Al-Adahi's showing up at the al-Qaida training camp, suggest that more transpired in the meeting than what Al-Adahi related.) In the habeas proceedings, Al-Adahi tried to explain his personal audience with bin Laden on the basis that "meeting with Bin Laden was common for visitors to Kandahar." Mem. Op. at 17. This is, as the government points out, utterly implausible. Al-Adahi's story was "contradicted by the undisputed evidence that in 2001 Usama bin Laden, who knew he was a military target of the United States, had gone into hiding under tight security . . . ." Br. of Appellants at 64.

As to the latter point the district court said nothing, despite the well-settled principle that false exculpatory statements are evidence – often strong evidence – of guilt. *See, e.g.*, *United States v. Penn*, 974 F.2d 1026, 1029 (8th Cir. 1992); *United States v. Meyer*, 733 F.2d 362, 363 (5th Cir. 1984). The court characterized the rest of the evidence about Al-Adahi's meetings with bin Laden as "sensational and compelling" but not "actual, reliable evidence that would justify" detention. Mem. Op. at 41. The court's statements are incomprehensible. On what possible ground can the court say that the evidence on this subject was, on the one hand, "compelling," and yet say, on the other hand, that it was not "actual" and "reliable"? All that comes to mind is the idea that two personal meetings with bin Laden are not enough to prove that an individual is part of al-Qaida. If that is what the court intended, then it was once again engaging in the

mistaken reasoning we mentioned in connection with conditional probability analysis. The court rounded off its discussion by characterizing the government's presentation as merely indicating that Al-Adahi had "familial ties to Usama bin Laden," a statement incorrect as a factual matter (Al-Adahi's family ties were to a top aide of bin Laden's) and one that misses the strong thrust of the evidence. The evidence derived its power not only from Al-Adahi's family relationships, but also from his meetings with bin Laden. That close association made it far more likely that Al-Adahi was or became part of the organization.

Rather than grasping this essential point, the district court called the evidence regarding the meetings a distraction – something that should not divert "the Court from its essential focus – the nature of Al-Adahi's own conduct, upon which this case must turn." Mem. Op. at 18. Here again the court's remarks are perplexing. If Al-Adahi's meetings with bin Laden were not his "own conduct," whose conduct were they?

The next event in this narrative greatly strengthened the government's case against Al-Adahi. Not long after his second meeting with bin Laden, Al-Adahi moved to the Al Nebras guesthouse. He said he wanted to go there because it was a gathering place for Muslims, as if that distinguished it from any other place he stayed during his time in Afghanistan. Al Nebras was not just another gathering place: it served as a staging area for al-Qaida recruits en route to the Al Farouq training camp. Al-Adahi was treated like a recruit. Staff at the guesthouse instructed him and the other recruits on how to pack and prepare for their training before taking a bus to Al Farouq. The district court seemed to think that Al-Adahi's stay at the guesthouse – one or two days – was evidence in his favor because it was so brief. But the court failed to take into account that Al Nebras functioned as a way station.

The district court dealt with this evidence in the following way: "the guesthouse evidence is not in itself sufficient to justify detention." Mem. Op. at 20. Note the "not in itself." Again the court erred. Al-Adahi's voluntary decision to move to an al-Qaida guesthouse, a staging area for recruits heading for a military training camp, makes it more likely – indeed, very likely – that Al-Adahi was himself a recruit. There is no other sensible explanation for his actions. This is why we wrote in *Al-Bihani* that an individual's attendance at an al-Qaida guesthouse is powerful – indeed "overwhelming[]" – evidence that the individual was part of al-Qaida. 590 F.3d at 873 n.2.

Al-Adahi left the guesthouse after a few days and, as expected, entered al-Qaida's Al Farouq training camp. By then it was August 2001. At least eight of the September 11th hijackers had trained at Al Farouq. While Al-Adahi was there, he received training in rocket-propelled grenades, other weapons, and basic physical fitness, as well as some classroom instruction. His statements to interrogators indicated that he had a deep knowledge of the operation of Al Farouq. He described camp leaders in a manner that showed he was familiar with them; he reported details of the camp's training regimen and layout; and he identified the types of weapons used for training. He also knew the training routines of other recruits.

The district court seemed to think it important to determine Al-Adahi's motive for attending the al-Qaida training camp. We do not understand why. Whatever his motive, the significant points are that al-Qaida was intent on attacking the United States and its allies, that bin Laden had issued a *fatwa* announcing that every Muslim had a duty to kill Americans, and that Al-Adahi voluntarily affiliated himself with al-Qaida.

According to Al-Adahi, he stayed at Al Farouq for seven to ten days, and then was expelled for smoking tobacco, a violation

of a camp rule. The government introduced evidence casting doubt on Al-Adahi's explanation for leaving the camp. This evidence – which included Al-Adahi's own statements – showed that trainees expelled from Al Farouq were treated as spies and beaten. Al-Adahi left Al Farouq unharmed. His story was that the camp's instructors treated him gently because they were close to his brother-in-law Riyadh. The government offered another explanation. Al-Adahi did not spend a great deal of time in the camp because he needed little training. He was not a green, untested, recruit. He had served in the Yemeni army, and he had been working as a security guard in Yemen. As to his loyalty to the al-Qaida cause, his sister was married to one of bin Laden's most trusted associates.

The district court reached the following conclusions about Al-Adahi's attendance at Al Farouq: (1) this was "not affirmative evidence that Al-Adahi embraced al-Qaida, accepted its philosophy, and endorsed its terrorist activities"; and (2) his training at Al-Farouq did not show that he "occup[ied] some sort of structured role in the hierarchy of the enemy force" or could "be deemed a member of the enemy's armed forces." Mem. Op. at 24-25 (internal quotation marks omitted).

The court appeared to rule that an individual must embrace every tenet of al-Qaida before United States forces may detain him. There is no such requirement. *See Awad*, slip op. at 19. When the government shows that an individual received and executed orders from al-Qaida members in a training camp, that evidence is sufficient (but not necessary) to prove that the individual has affiliated himself with al-Qaida. *See id.*; *Gherebi v. Obama*, 609 F. Supp. 2d 43, 69 (D.D.C. 2009). Al-Adahi's statements confirm that he received and followed orders while he was at Al Farouq. His attendance at an al-Qaida military training camp is therefore – to put it mildly – strong evidence that he was part of al-Qaida. In *Al-Bihani*, we stated that if a

person stays in an al-Qaida guesthouse or attends an al-Qaida training camp, this constitutes "overwhelming" evidence that the United States had authority to detain that person. 590 F.3d at 873 n.2.

The district court ruled that Al-Adahi did not "receive and execute" orders because he violated the camp rule against smoking tobacco. Mem. Op. at 23, 25. This was error. Al-Adahi's violation of a rule or rules did not erase his compliance with other orders. One would not say that an Army trainee ceased to be part of the Army if he failed to shine his shoes or overslept one morning. Furthermore, there was no evidence that Al-Adahi ever affirmatively disassociated himself from al-Qaida, even though he "accepted his expulsion." *Id.* at 40.

The district court ended its discussion of Al-Adahi's training at Al Farouq with the following statement: Al-Adahi's "admission that he trained at Al Farouq is not sufficient to carry the Government's burden of showing that he was a part, or substantial supporter, of enemy forces." *Id.* at 25. We disagree that this evidence, standing alone, was insufficient. *See Al-Bihani*, 590 F.3d at 873 n.2. In any event, we are sure that the court erred in treating this evidence as if it stood alone.

The court gave similar treatment to the government's proof that Al-Adahi wore the same model of Casio watch the military has linked to al-Qaida and terrorist activity. When Pakistani authorities picked up Al-Adahi they confiscated his watch. A witness reported seeing him wearing the Casio watch before his capture. The district court threw out these telling facts because, after all, "Casio watches are hardly unique items, even in Afghanistan." Mem. Op. at 34.

It is true that not everyone in Afghanistan with a Casio watch could be identified with al-Qaida. But the evidence did

not relate to every such person. It related to a particular individual wearing a Casio model favored by al-Qaida leaders, an individual who had met with bin Laden, had stayed in an al-Qaida guesthouse, and had trained in an al-Qaida camp.

The government also introduced other evidence of Al-Adahi's close connection to the al-Qaida leadership. Al-Adahi had detailed personal knowledge about a group of twelve men who worked for bin Laden. For example, he knew that one man was a trained sniper and could read, write, and speak English; he knew that another spoke Pashtu and Farsi and sent men to Al Farouq for training; and he knew that one "had fat thighs but was quick," owned a four-door pickup truck, fought in Chechnya and Bosnia, and had been with bin Laden in Sudan.

This evidence tended to show Al-Adahi's close relationship with these men and thus strengthened the probability that he was part of al-Qaida. Yet the district court declined to credit the evidence because it was possible that Al-Adahi could have learned the biographical information in some other way, particularly since some of the men were from his hometown in Yemen. Mem. Op. at 35. In so ruling the court committed what a noted historian has called "the fallacy of the possible proof." DAVID HACKETT FISCHER, HISTORIANS' FALLACIES: TOWARD A LOGIC OF HISTORICAL THOUGHT 53 (1970). "Valid empirical proof requires not merely the establishment of possibility, but an estimate of probability." *Id.* Yet the court spoke only of a possible alternative explanation for Al-Adahi's knowledge of bin Laden's bodyguards. At no point did the court make any finding about whether this alternative was more likely than the government's explanation. But such a "comparative judgment about the evidence" is at the heart of the preponderance standard of proof. *Lindsay v. Nat'l Transp. Safety Bd.*, 47 F.3d 1209, 1213 (D.C. Cir. 1995).

Al-Adahi was in Kabul when the September 11 attacks occurred. He said that he then decided to take a month long vacation and travel throughout the countryside. He said he went to Kabul because he was bored staying in Kandahar. When the United States began its military campaign in Afghanistan on October 7, 2001, Al-Adahi claimed he was still in Kabul. About a week and a half after the bombing began, he left for Khost, Afghanistan, where he stayed in a mosque for about two weeks. He said he then left Khost to return to Kandahar to search for his sister. He spent another two to three weeks in Kandahar, including two or three days in a hospital recuperating from injuries to his arm and side. Al-Adahi said he sustained his injuries in a motorcycle accident. He offered different versions of how the accident occurred: he hit a speed bump on his way to the market; he crashed into a cart as he was riding around Kandahar; he fell off his motorcycle while attempting to flee the United States bombing; he crashed trying to avoid a small car.

Al-Adahi left the hospital for Pakistan on a bus carrying wounded Arabs and Pakistanis. At one point in his interrogation, Al-Adahi described these fourteen men as Taliban soldiers; but he testified at the habeas proceeding that he learned this only from a newspaper article.

From Al-Adahi's movements in Afghanistan, his injuries, his shifting versions of his supposed motorcycle accident, and his capture on a bus loaded with wounded Taliban fighters, the government infers that Al-Adahi was complying with "bin Laden's order to persist in the jihad" after the American attacks. Br. of Appellants at 21. The district court, once again treating items of evidence in isolation, pronounced that "there is no evidence that [Al-Adahi] sought to join or was already part of a band of fighters fleeing the region." Mem. Op. at 39. The court was wrong, and clearly so. Al-Adahi's capture on a bus carrying only himself and wounded Taliban fighters constituted such

evidence, as did his injuries, his movements in the country, and the contradictions contained in his explanations. We do not say that any of these particular pieces of evidence are conclusive, but we do say that they add to the weight of the government's case against Al-Adahi and that the district court clearly erred in tossing them aside. *See Awad*, slip op. at 14-15; *Prandy-Binett*, 5 F.3d at 559-60.

One of the oddest things about this case is that despite an extensive record and numerous factual disputes, the district court never made any findings about whether Al-Adahi was generally a credible witness or whether his particular explanations for his actions were worthy of belief. The court's omissions are particularly striking in light of the instructions in al-Qaida's training manuals for resisting interrogation. For those who belong to al-Qaida, "[c]onfronting the interrogator and defeating him is part of your jihad." To this end al-Qaida members are instructed to resist interrogation by developing a cover story, by refusing to answer questions, by recanting or changing answers already given, by giving as vague an answer as possible, and by claiming torture. Put bluntly, the instructions to detainees are to make up a story and lie. Despite this the district court displayed little skepticism about Al-Adahi's explanations for his actions. To the extent the court expressed any doubts, it addressed them to the government's case and did so on the mistaken view that each item of the government's evidence needed to prove the ultimate issue in the case.

We could go on, but what we have written thus far is enough to show that the district court clearly erred in its treatment of the evidence and in its view of the law. *Cf. Barhoumi v. Obama*, No. 09-5383, slip op. at 12-13 (D.C. Cir. June 11, 2010); *Awad*, slip op. at 17. The court's conclusion was simply not a "permissible view[] of the evidence." *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985). And

it reached this conclusion through a series of legal errors, as we have discussed. We have already mentioned the suggestion in *Al-Bihani* that attendance at either an al-Qaida training camp or an al-Qaida guesthouse "would seem to overwhelmingly, if not definitively, justify" detention. 590 F.3d at 873 n.2. The evidence against Al-Adahi showed that he did both – stayed at an al-Qaida guesthouse and attended an al-Qaida training camp. And the evidence showed a good deal more, from his meetings with bin Laden, to his knowledge of those protecting bin Laden, to his wearing of a particular model of Casio watch, to his incredible explanations for his actions, to his capture on a bus carrying wounded Arabs and Pakistanis, and so on. One of the most damaging and powerful items of evidence against him is classified.[5] In all there can be no doubt that Al-Adahi was more likely than not part of al-Qaida. We therefore reverse and remand with instructions to the district court to deny Al-Adahi's petition for a writ of habeas corpus.[6]

---

[5]

[6] Al-Adahi filed a cross-appeal. He argues that the district court had no authority to admit hearsay bearing on his habeas petition. We rejected that argument in *Al-Bihani*, 590 F.3d at 879, and again in *Awad*, slip op. at 11. *Al-Bihani* also forecloses Al-Adahi's argument that admitting hearsay violated his Sixth Amendment right of confrontation. 590 F.3d at 879. The district court did not abuse its discretion by not ruling separately on the reliability of each item of hearsay, despite Al-Adahi's claim that the case management order required it to do so. *Barhoumi*, slip op. at 9-10. His claim that statements he made outside the presence of counsel should be suppressed also fails: Al-Adahi cites no precedent extending the *Miranda v. Arizona*, 384 U.S. 436 (1966), line of cases beyond the

*So Ordered.*

---

criminal context. *Cf.* Mem. Op. at 21 n.14. As we noted in *Al-Bihani*, these constitutional habeas proceedings are not subject to all the protections given to defendants in criminal prosecutions. 590 F.3d at 876. Al-Adahi points to the Army Rules of Professional Responsibility as also requiring suppression of his ex parte statements, but he waived this argument by failing to raise it until his cross-appeal reply brief. *See Rollins Environmental Services (NJ), Inc. v. EPA,* 937 F.2d 649, 652 n.2 (D.C. Cir. 1991).

Al-Adahi also claims his statements should be suppressed pursuant to the Third Geneva Convention. Even if the Convention had been incorporated into domestic U.S. law and even if it provided an exclusionary rule, Congress has provided explicitly that the Convention's provisions are not privately enforceable in habeas proceedings. *See* Military Commissions Act of 2006 § 5, Pub. L. No. 109-366, 120 Stat. 2631-32; *Noriega v. Pastrana,* 564 F.3d 1290, 1296-97 (11th Cir. 2009); *Boumediene v. Bush,* 476 F.3d 981, 988 n.5 (D.C. Cir. 2007).