# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 18, 2012        Decided June 18, 2013

No. 11-5344

ABDUL AL QADER AHMED HUSSAIN, DETAINEE,
APPELLANT

v.

BARACK HUSSEIN OBAMA, PRESIDENT OF THE UNITED STATES,
ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-02104)

*Wesley R. Powell* argued the cause and filed the briefs for appellant.

*Henry C. Whitaker*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ian Heath Gershengorn*, Deputy Assistant Attorney General, and *Robert M. Loeb*, Attorney.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Opinion filed by *Senior Circuit Judge* EDWARDS, concurring in the judgment.

GRIFFITH, *Circuit Judge*: The district court denied appellant's petition for a writ of habeas corpus challenging his detention at Guantanamo Bay. We affirm the district court because its findings of fact were not clearly erroneous, and those facts support the conclusion that appellant was more likely than not a part of enemy forces at the time of his capture.

I

The background of this case is set forth in the district court's thorough opinion, *see Hussein v. Obama*, 821 F. Supp. 2d 67, 68-75 (D.D.C. 2011), on which we rely to recite those facts relevant to this appeal. Appellant Abdul al Qader Ahmed Hussain[1] is a citizen of Yemen detained at the United States Naval Base at Guantanamo Bay. Sometime in 1999, Hussain left his home in Yemen for Pakistan. He initially spent a few weeks in Karachi and then traveled to Quetta, where he stayed for about three months. While in Quetta, he lived in a mosque run by the Jama'at al-Tablighi (JT) organization. From Quetta, Hussain traveled to Afghanistan, where he spent approximately three months. After that, Hussain returned again to a JT mosque in Quetta in April or May of 2000 until about June, when he left for Kabul, Afghanistan. In approximately August 2000, he returned once again to Quetta for another three-month stay at a JT mosque. Then, in November 2000, Hussain moved to Afghanistan and settled for ten months in an area north of Kabul

---

[1] The district court spelled petitioner's name "Hussein." We use "Hussain," the spelling employed by both parties on appeal.

that was ravaged by war between the Taliban and the Northern Alliance. Hussain lived near the front lines with three armed Taliban guards. Hussain's Taliban housemates supplied him with an AK-47 rifle and trained him in its use. After al Qaeda attacked the United States on September 11, 2001, Hussain fled Afghanistan and returned to Pakistan where he lived at yet another JT mosque in Lahore. He was captured in Faisalabad in March 2002,[2] and was transferred to Guantanamo Bay soon thereafter.

Seeking to challenge his detention, Hussain filed a petition for a writ of habeas corpus with the district court on October 27, 2005. Uncertain of its jurisdiction to hear habeas petitions from detainees at Guantanamo Bay, the district court stayed the case in January 2006. In the wake of the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), the district court heard Hussain's petition, but denied him relief. The district court concluded that Hussain was part of al Qaeda or the Taliban at the time of his capture, based on evidence of what he did and with whom he stayed in Pakistan and Afghanistan as well as his efforts to explain away that evidence, which the court found implausible. *See Hussein*, 821 F. Supp. 2d at 79. Hussain now appeals.

We review the district court's factual findings for clear error. We review de novo the ultimate legal determination of whether those facts support detention. *See Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010) ("Determining whether a detainee was 'part of' an associated force is a mixed question of law and fact" because "whether a detainee's alleged conduct . . .

---

[2] The district court incorrectly refers to "May 23, 2002," as the date of Hussain's capture. But on appeal, Hussain acknowledges that he was captured in "March 2002" after being in Pakistan for "approximately six months."

justifies his detention under the AUMF is a legal question" and "whether the government has proven that conduct" is a factual one. (internal citations omitted)).

## II

The Authorization for Use of Military Force (AUMF), enacted in response to the terrorist attacks of September 11, 2001, permits the President to detain individuals who "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such . . . persons." Pub. L. No. 107–40, § 2(a), 115 Stat. 224 (2001); *see Hamdi v. Rumsfeld,* 542 U.S. 507, 519 (2004) (stating that the AUMF "clearly and unmistakably authorized detention" of enemy combatants). As we have stated repeatedly, this authority justifies holding a detainee at Guantanamo if the government shows, by a preponderance of the evidence, that the detainee was part of al Qaeda, the Taliban, or associated forces at the time of his capture. *See Khairkhwa v. Obama*, 703 F.3d 547, 548 (D.C. Cir. 2012); *Uthman v. Obama*, 637 F.3d 400, 403 (D.C. Cir. 2011); *Salahi v. Obama*, 625 F.3d 745, 751-52 (D.C. Cir. 2010); *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010); *Awad v. Obama*, 608 F.3d 1, 11-12 (D.C. Cir. 2010); *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010).[3] Hussain

---

[3] Our concurring colleague takes issue with our extensive precedent in detainee habeas appeals, arguing that we have not always kept to the preponderance of the evidence standard we have thus far invoked. But he is mistaken to say that we have "required" the standard. *Post*, at 1 (Edwards, J., concurring). In *Al-Adahi* we wrote that although the standard is "constitutionally permissible . . . we have yet to decide whether [it] is required." *Al-Adahi v. Obama*, 613 F.3d 1102, 1103 (D.C. Cir. 2010) (citation omitted). Furthermore, nothing about this case requires us to settle the question because the preponderance standard is easily met here. This case is a fastball down

challenges this standard on two grounds, which he acknowledges we have rejected before. Appellant Br. 15 n.2. We do so again.

Hussain argues that the government must show that he was involved in the "command structure" of al Qaeda or the Taliban, rather than merely "part of" these organizations. But "[n]owhere in the AUMF is there a mention of command structure." *Awad*, 608 F.3d at 11. While such a showing would be enough to sustain Hussain's detention, it is not necessary. *Id.* We have long held that requiring proof that a detainee was part of the "command structure" is too demanding; the sweep of the Executive's detention authority under the AUMF is broader. *See Uthman*, 637 F.3d at 403; *see also Salahi*, 625 F.3d at 751-52 (quoting *Bensayah*, 610 F.3d at 725).

Hussain also argues that the government must show that he personally picked up arms and engaged in active hostilities against the United States. But again, this argument demands more than the AUMF requires. *See Khairkhwa*, 703 F.3d at 550 (collecting cases that reject the notion that a detainee must have engaged in hostilities); *Awad*, 608 F.3d at 11 (Once the government demonstrated that the detainee was part of al Qaeda, "the requirements of the AUMF were satisfied."); *Al-Bihani*, 590 F.3d at 869 (permitting the detention of a detainee who "worked as the [55th Arab B]rigade's cook and carried a brigade-issued weapon, but never fired it in combat"). As we noted in *Khairkhwa*, permitting detention only for those detainees who engaged in active hostilities would be inconsistent with the realities of "modern warfare" in which "commanding officers rarely engage in hand-to-hand combat;

---

the middle, not a curveball low and away. It is well within the strike zone.

supporting troops behind the front lines do not confront enemy combatants face to face; supply-line forces, critical to military operations, may never encounter their opposition." *Khairkhwa*, 703 F.3d at 550. Nothing has changed since we rejected these arguments only months ago. We are bound by our precedent and therefore reject Hussain's challenges. Having done so, we offer a brief overview of how we evaluate evidence in these cases.

We have adopted no categorical rules to determine whether a detainee is "part of" an enemy group. Instead, we look at the facts and circumstances in each case. *See Bensayah*, 610 F.3d at 725 ("It is impossible to provide an exhaustive list of criteria for determining whether an individual is 'part of' al Qaeda."). We look at each piece of evidence "in connection with all the other evidence" in the record, and not in isolation. *Almerfedi v. Obama*, 654 F.3d 1, 4 (D.C. Cir. 2011); *see also Salahi v. Obama*, 625 F.3d at 753 ("Merely because a particular piece of evidence is insufficient, standing alone . . . does not mean that the evidence may be tossed aside . . . . The evidence must be considered in its entirety in determining whether the government has satisfied its burden of proof." (internal citation and quotation marks omitted)). The facts the district court found and the inferences the district court drew from them support the conclusion that Hussain was a part of al Qaeda or the Taliban when he was captured.

III

Perhaps the most damning evidence supporting the district court's conclusion that Hussain was part of an enemy force when he was captured is his ten-month stay near the front lines of battle in war-torn Afghanistan. Hussain does not contest that he lived near the battlefront with Taliban warriors who gave him

an AK-47 and taught him how to use it. Evidence that Hussain carried an assault rifle given him by Taliban forces while living among Taliban forces near a battle line fought over by Taliban forces brings to mind the common sense view in the infamous duck test. *See, e.g.*, *Dole v. Williams Enterprises, Inc.*, 876 F.2d 186, 188 n.2 (D.C. Cir. 1989) (adopting the "now-infamous 'duck-test,' dressed up in appropriate judicial garb: 'WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck.'").[4] Evidence that Hussain bore a weapon of war while living side-by-side with enemy forces on the front lines of a battlefield at least invites – and may very well compel – the conclusion that he was loyal to those forces. We have repeatedly affirmed the propriety of this common-sense inference. *Alsabri v. Obama*, 684 F.3d 1298, 1306 (D.C. Cir. 2012) ("[I]t is difficult to believe that Taliban fighters would allow an individual to infiltrate their posts near a battle zone unless that person was understood to be a part of the Taliban." (internal quotation marks omitted)); *see also Suleiman v. Obama*, 670 F.3d 1311, 1313-14 (D.C. Cir. 2012); *Al-Madhwani v. Obama*, 642 F.3d 1071, 1075 (D.C. Cir. 2011). Hussain

---

[4] Our concurring colleague thinks such an inference is "quite invidious because, arguably, any young, Muslim man traveling in areas in which terrorists are known to operate would pass the 'duck test.'" *Post*, at 4 (Edwards, J., concurring). But the objectionable profiling our colleague fears played no part in the conclusion of the district court and is nowhere present in our reasoning. The district court cared not a whit whether Hussain is Muslim (or not). Neither do we. The innocent wayfaring teenager our colleague invokes bears no resemblance to Hussain, who was not simply in the wrong place at the wrong time. He was in the wrong place, at the wrong time, with the wrong people, doing the wrong things. Our precedent, to say nothing of common sense, supports the inference that the district court drew and which we affirm.

suggests a more benign inference. He argues that his Taliban housemates gave him the AK-47 for protection from wild animals and thieves, and that they were not living all that close to the lines of battle anyway. But the district court permissibly rejected this version of the uncontested facts in favor of the government's far more plausible explanation. *See Hussein*, 821 F. Supp. 2d at 78. That finding was not clear error.[5]

Although the parties disagree about precisely when Hussain finally left Afghanistan, there is no dispute that he had left his Taliban housemates near the battlefront, returned to Kabul by September 11, 2001, and fled to Pakistan thereafter. The district court found Hussain's story of his movements after he left Kabul unbelievable. He claimed, somewhat inconsistently, that he left Afghanistan both to return to Yemen to be with his family and possibly to marry, and to live in Pakistan to study, either computers or the Koran. But the record lends no support to either story. Once he left Afghanistan, Hussain stayed in Pakistan until his capture, and although he moved from Lahore to Faisalabad, he made no effort to return to Yemen or to attend any school. We agree with the district court that "all of the petitioner's explanations seem to be little more than *post hac* [sic] attempts to present goals that change as necessary to support his presence in one part of the world or another. The sum of the petitioner's inexplicable explanations for his actions

---

[5] The concurrence attempts to downplay Hussain's possession of the weapon. This misconstrues the district court's legal reasoning. Mere possession of the weapon – or carrying it around – was not the critical point. The district court's conclusion that Hussain was loyal to enemy forces turned on the fact that Taliban soldiers gave him an AK-47 while he lived among them near the battle lines. Under our precedent, that alone demonstrates loyalty to a shared cause, even if Hussain never brandished the weapon in combat. *Al-Bihani*, 590 F.3d at 869.

renders his testimony completely incredible." *Id.* at 79. That finding was not clear error and, under our precedent, provides evidence of Hussain's continued affiliation with enemy forces after leaving Afghanistan. In other detainee cases, we have found that false cover stories, like those spun by Hussain, "are evidence—often strong evidence—of guilt." *Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010); *see Uthman*, 637 F.3d at 407. In *Almerfedi*, we stated that "'false exculpatory statements' amount to *evidence in favor of the government*." *Almerfedi*, 654 F.3d at 7 (quoting *Al-Adahi*, 613 F.3d at 1107) (emphasis added).

The district court also relied on Hussain's "extended stays at two Jama'at al-Tablighi mosques." *Hussein*, 821 F. Supp. 2d at 77. As we have already recited, on two separate occasions, Hussain lived at a JT mosque in Pakistan for about three months. As we noted in *Almerfedi*, JT is "an Islamic missionary organization that is a Terrorist Support Entity closely aligned with al Qaeda."*Almerfedi*, 654 F.3d at 6 (internal quotation marks omitted). Although evidence of association with the JT mosques alone "presumably would not be sufficient to carry the government's burden because there are surely some persons associated with Jama'at Tablighi who are not affiliated with al-Qaeda," we held in *Almerfedi* that extended affiliation with the group over time "is probative." *Id.* The district court concluded that Hussain's multiple stays at JT mosques between his sojourns to Afghanistan suggests an affiliation with al Qaeda. Because *Almerfedi* plainly permits such an inference, we see no error in the district court having drawn it.[6]

---

[6] Hussain stayed at JT mosques for two other, shorter, periods. Although these short stays may not in and of themselves establish an affiliation with al Qaeda, repeated visits to JT mosques, coupled with his extended stays there, support the inference that Hussain was affiliated with the terrorist group.

Hussain faults the district court for holding that any contact with the JT organization suggests an affiliation with al Qaeda. But Hussain misstates the district court's analysis. As we have just shown, the district court did not rely on such a categorical rule, but engaged in the type of fact-specific inquiry we require to reach its conclusion that Hussain's repeated and extended stays at JT mosques suggest an affiliation with al Qaeda. *See Bensayah*, 610 F.3d at 725.[7]

Having been "part of" enemy forces while living in northern Afghanistan at least through August 2001, Hussain makes no argument that he affirmatively cut those ties before his capture only six months later. And there is no evidence to suggest that leaving his Taliban housemates in Afghanistan marked a turning point from Hussain's old ways and an end to his connection with enemy forces. Nothing in the record shows the type of concrete, affirmative steps to dissociate that we look to when those once part of an enemy group claim they have left. *See Alsabri*, 684 F.3d at 1307 (noting that the detainee "proffers no evidence that he took steps to dissociate himself from those groups in the months between his departure from the battle lines and his capture"); *Al-Adahi*, 613 F.3d at 1109 (noting that "there was no evidence that [the detainee] ever affirmatively disassociated

---

[7] The government declared in the district court that it would not seek to prove Hussain's formal affiliation with JT. Red. Br. Addendum at 17. And the district court did not rely on any formal affiliation between Hussain and JT. It concluded only that his repeated stays at the JT mosques, irrespective of any formal affiliation, suggest that Hussain was "part of" al Qaeda. As this inference does not rest on a formal affiliation between Hussain and JT, the government's declaration below is simply irrelevant. Moreover, it was made before *Almerfedi* explained the significance of those stays.

himself from al-Qaida," even when he was expelled from the group). In fact, the evidence points the other way. After living for ten months at the battlefront in Afghanistan with Taliban guards who armed him, Hussain fled to Pakistan, where he remained until his capture shortly thereafter, and, when asked to explain his actions in the interim, Hussain lied to the court. *See Almerfedi*, 654 F.3d at 7 ("'[F]alse exculpatory statements' amount to evidence in favor of the government." (quoting *Al-Adahi*, 613 F.3d at 1107)).

Finally, Hussain argues that the district court erred by failing to determine whether he affiliated with al Qaeda, the Taliban, or both. Both are enemy forces, and affiliation with either justifies detention. *See Al Alwi v. Obama*, 653 F.3d 11, 18 (D.C. Cir. 2011) (affirming the district court's denial of the writ where it was clear that petitioner was "'part of' the Taliban *or* al Qaeda" (emphasis added)). In any event, membership in these two groups sometimes overlaps, for example, when Taliban forces bring Arabic-speaking al Qaeda-affiliated members into their ranks. *See Al-Bihani*, 590 F.3d at 872 (noting that the 55th Arab Brigade was "an Al Qaeda-affiliated outfit . . . [fighting] alongside the Taliban while the Taliban was harboring Al Qaeda"). The government's evidence fits this pattern. Hussain associated with Taliban guards in Afghanistan and an al Qaeda-affiliated group in Pakistan. In sum, there was no error in the district court's failure to distinguish between when Hussain was a part of al Qaeda and when he was a part of the Taliban.

IV

For the foregoing reasons, we *affirm* the district court's denial of Hussain's petition for a writ of habeas corpus.

*So ordered.*

Edwards, *Senior Circuit Judge*, concurring in the judgment: Abdul al Qader Ahmed Hussain was a teenager when he was taken into custody and sent to Guantanamo Bay. He has been confined in Guantanamo Bay for eleven years. His petition for habeas relief should be granted, but his claim is doomed to fail because of the vagaries of the law.

———

Under the applicable law, the President is authorized to detain individuals who "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such . . . persons." Authorization for the Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001). The Government cannot plausibly contend that Hussain planned, authorized, or committed terrorist attacks. The only real question in this case is whether Hussain "aided" those who engaged in terrorist attacks. I can find no evidence of this in the record before the court.

To hold a detainee at Guantanamo, we have required that the Government show, by a *preponderance of the evidence*, that the detainee was a "part of" al Qaeda, the Taliban, or associated forces at the time of his capture. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) ("Although we doubt . . . that the [Constitution] requires the use of the preponderance standard, we will not decide the question in this case. As we [have done previously], we will assume *arguendo* that the government must show by a preponderance of the evidence that [the detainee] was part of al-Qaida."). Under the preponderance of the evidence standard, "the factfinder must evaluate the raw evidence, [and] find[] it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993). The evidence in this case may satisfy the lesser substantial evidence standard, *see Dickinson v. Zurko*, 527 U.S. 150, 162

(1999) (the substantial evidence standard requires a reviewing court "to ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion"), but it does not meet the preponderance of the evidence test.

The result in this case is unsurprising because, in my view, it fits the mold of a number of the decisions of this court that have recited the "preponderance of the evidence" standard while in fact requiring nothing more than substantial evidence to deny habeas petitions. I do not mean to sound self-righteous in offering this observation – it is merely my considered judgment. In truth, the Guantanamo detainee cases have presented extraordinary challenges for the judiciary. This reality has drawn rueful commentary in judicial opinions, scholarly articles, speeches by members of the Legislative Branch, pronouncements from the Executive Branch, and media reports. Any knowledgeable person who looks carefully at the applicable legislative enactments and the Supreme Court decisions affecting Guantanamo detainees, and the resulting progeny of district court and court of appeals opinions, will comprehend how the preponderance of the evidence and substantial evidence standards have come to be conflated. I think it is important to at least acknowledge what is happening in our jurisprudence.

––––––

The facts relied upon by the Government in this case are quite simple. (I have blocked the statement of facts merely to highlight it, not to suggest that it is quoted material.)

Sometime in 1999, when he was a teenager, Hussain left his home in Yemen and headed for Pakistan. He initially spent a few weeks in Karachi and then traveled to Quetta, where he stayed for about three months. While in Quetta, he lived in a mosque run by the Jama'at al-Tablighi ("JT")

organization. There is nothing to indicate that he was a part of the organization. From Quetta, Hussain traveled to Afghanistan, where he spent approximately three months. After that, Hussain returned again to a JT mosque in Quetta in April or May of 2000 until about June, when he left for Kabul, Afghanistan. There is nothing to indicate what he did during his brief stay at the mosque. In approximately August 2000, he returned once again to Quetta for another three-month stay at a JT mosque. Again, there is nothing to indicate what he did during his brief stay at the mosque. Then in November 2000, Hussain moved to Afghanistan where he remained for ten months in an area north of Kabul not far from where the Taliban and the Northern Alliance had engaged in battles. Hussain lived near the front lines with three fellow Arabic speakers who were Taliban guards. Hussain's housemates supplied him with an AK-47 rifle and trained him in its use. However, there is nothing to indicate that Hussain used the weapon for any purpose; there is nothing to indicate that he even carried the gun around with him while residing in the area north of Kabul; and there is nothing to indicate that he ever engaged in any acts of war or terrorism during his temporary residence in the area north of Kabul. Indeed, there is no evidence that Hussain ever engaged in any acts of war or terrorism. When al Qaeda attacked the United States on September 11, 2001, Hussain was on his way from Afghanistan to Pakistan, where he lived at yet another JT mosque in Lahore. Again, there is not one iota of evidence as to what he did while at the mosque. Hussain wandered around for a brief time between September 2001 and March 2002, but there is nothing to indicate that he was affiliated with enemy forces or engaged in acts of war or terrorist activities. He was taken into custody in Faisalabad in March 2002 and was transferred to Guantanamo Bay soon thereafter.

That's it.

The majority invokes the "walks like a duck" test to conclude that the evidence "at least invites – and may very well compel – the conclusion that [Hussain] was loyal to [enemy] forces." This is not a proper application of the preponderance of the evidence test with respect to the matter in dispute. And it is quite invidious because, arguably, any young, Muslim man traveling or temporarily residing in areas in which terrorists are known to operate would pass the "duck test." That is exactly why the court should faithfully apply the proper evidentiary standard. Hussain says that he was given a weapon for his own self-protection. The Government does not contend nor did the District Court find that Hussain carried the weapon around with him during his stay in the area north of Kabul or that he used the weapon for any purpose; nor does the Government contend that Hussain ever joined with enemy forces on the front lines. Therefore, without more, the fact that Hussain moved to Afghanistan where he remained for ten months in an area north of Kabul is not "sufficiently reliable and sufficiently probative to *demonstrate the truth of the asserted proposition* with the requisite degree of certainty" that Hussain "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." *Concrete Pipe*, 508 U.S. at 622 (emphasis added).

The majority also concludes that the District Court did not commit clear error in finding that "Hussain's continued affiliation with enemy forces after leaving Afghanistan" was sufficient to make out the case against him. But in doing so, the majority implicitly shifts the burden of proof from the Government to Hussain. Under the approach adopted by the majority, Hussain's petition is rejected because he could not offer a coherent story about his whereabouts during the times in question, not because the Government proved by a preponderance of the evidence that he was "part of" al Qaeda,

the Taliban, or associated forces. Respectfully, this is not an appropriate application of the preponderance of the evidence standard. It was the Government's burden to show that Hussain "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001," and this burden was not met by Hussain's failure to explain his whereabouts. Hussain is not presumed to be guilty under the applicable law merely because he was taken into custody and transferred to Guantanamo.

Is it really surprising that a teenager, or someone recounting his teenage years, sounds unbelievable? What is a judge to make of this, especially here, where there is not one iota of evidence that Hussain "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such . . . persons"? I do not mean to suggest that a teenager cannot be a terrorist or an enemy combatant or that, if so, he should get a pass because of his age. Rather, the salient point is quite simple: the burden of proof was on the Government to make the case against Hussain by a preponderance of the evidence. In my view, it failed to carry this burden.

This said, I am constrained by the law of the circuit to concur in the judgment of the court. The majority opinion is unassailable in holding that our precedent (which conflates the preponderance of the evidence and substantial evidence standards) supports the result reached. I have no authority to stray from precedent. However, when I review a record like the one presented in this case, I am disquieted by our jurisprudence. I think we have strained to make sense of the applicable law, apply the applicable standards of review, and adhere to the commands of the Supreme Court. The time has come for the President and Congress to give serious consideration to a different approach for the handling of the Guantanamo detainee cases.