# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 24, 2009        Decided June 28, 2010

No. 08-5537

BELKACEM BENSAYAH, DETAINEE, CAMP DELTA,
APPELLANT

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01166-RJL)

———

*Mark C. Fleming* argued the cause for appellant. With him on the briefs were *Stephen H. Oleskey, Robert C. Kirsch, Joshua D. Jacobson, Allyson J. Portney, Seth P. Waxman, Paul R. Wolfson, Robert J. McKeehan, Douglas F. Curtis,* and *Paul M. Winke.*

*Sharon Swingle,* Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Michael F. Hertz,* Deputy Assistant Attorney General, and *Douglas N. Letter, Thomas M. Bondy,* and *Robert M. Loeb,* Attorneys. *Ronald J. Wiltsie II,* Attorney, entered an appearance.

Before: GINSBURG and HENDERSON, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: Belkacem Bensayah petitioned the district court for a writ of habeas corpus in order to challenge his detention at the Naval Station at Guantanamo Bay, Cuba. The district court denied his petition, holding the Government had shown by a preponderance of the evidence that Bensayah was being held lawfully pursuant to the Authorization for Use of Military Force (AUMF), Pub. L. 107-40, § 2(a), 115 Stat 224, 224 (2001), because he had provided "support" to al Qaeda. *Boumediene v. Bush*, 579 F. Supp. 2d 191, 198 (2008). On appeal the Government has eschewed reliance upon certain evidence the district court had considered and has abandoned its position that Bensayah's detention is lawful because of the support he rendered to al Qaeda; instead it argues only that his detention is lawful because he was "part of" that organization — a contention the district court did not reach.

We agree with the Government that its authority under the AUMF extends to the detention of individuals who are functionally part of al Qaeda. The evidence upon which the district court relied in concluding Bensayah supported al Qaeda is insufficient, however, to show he was part of that organization. We therefore remand this case for the district court to determine whether, considering all reliable evidence, Bensayah was functionally part of al Qaeda.

## I. Background

Bensayah, an Algerian citizen, was arrested by the Bosnian police on immigration charges in late 2001. He was

later told that he and five other Algerian men arrested in Bosnia were suspected of plotting to attack the United States Embassy in Sarajevo. Because the ensuing three-month investigation failed to uncover evidence sufficient to continue the detention of the six men, the Supreme Court of the Federation of Bosnia and Herzogovina ordered that they be released. The men were then turned over to the United States Government and transported to the U.S. Naval Station at Guantanamo Bay, where they have been detained since January 2002.

In 2004 Bensayah and the five other detainees petitioned the district court for writs of habeas corpus. Although their petitions were originally dismissed, *Khalid v. Bush*, 355 F. Supp. 2d 311, 314 (D.D.C. 2005), they were reinstated after the Supreme Court held that detainees at Guantanamo Bay are constitutionally "entitled to the privilege of habeas corpus to challenge the legality of their detention," *Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008).

In August 2008 the district court entered a case management order (CMO) establishing the procedures that would govern this case. *See* CMO, *Boumediene v. Bush*, No. 04-1166 (RJL) (D.D.C. Aug. 27, 2008). The CMO placed upon the Government the burden of establishing, by a preponderance of the evidence, the lawfulness of the petitioner's detention. The Government was required to submit a return stating the factual and legal bases for detaining that prisoner, who was then required to file a traverse stating the relevant facts in support of his petition and a rebuttal of the Government's legal justification for his detention. The CMO allowed discovery only "by leave of the Court for good cause shown," and required that requests for discovery

> (1) be narrowly tailored; (2) specify why the request is likely to produce evidence both relevant and material to the petitioner's case; (3) specify the nature of the request ...; and (4) explain why the burden on the Government to produce such evidence is neither unfairly disruptive nor unduly burdensome.

It also required the Government to provide to the petitioner any exculpatory evidence "contained in the material reviewed in developing the return for the petitioner[] and in preparation for the hearing for the petitioner."

The Government claimed authority to detain the six men pursuant both to the AUMF and to the President's inherent powers as Commander in Chief. It argued each of the six men was lawfully detained as an "enemy combatant," which the district court had in an earlier order defined as

> an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

*Boumediene v. Bush*, 583 F. Supp. 2d 133, 135 (2008). The Government contended all six men were lawfully detained because they had planned to travel to Afghanistan in late 2001 in order to take up arms against the United States and allied forces. It also contended Bensayah's detention was lawful because he was a member of and a travel facilitator for al Qaeda. The only direct evidence the Government offered in support of its contentions about Bensayah was contained in a classified document ████████████████ from an unnamed source and in certain other pieces of evidence it claimed corroborated that document.

The district court granted habeas to each petitioner other than Bensayah, holding the Government had failed to show by a preponderance of the evidence that they had planned to travel to Afghanistan to fight against the United States. *Boumediene*, 579 F. Supp. 2d at 197–98. Because the Government did not sufficiently establish the reliability of the allegations in the classified document about those petitioners, the court refused to credit those allegations.

The district court denied Bensayah's petition because it determined "the Government has met its burden by providing additional evidence that sufficiently corroborates its allegations from this unnamed source that Bensayah is an al-Qaida facilitator." *Id.* at 198. The corroborative evidence provided by the Government is of three sorts: (1) evidence linking Bensayah to al Qaeda, and specifically to a "senior al-Qaida facilitator"; (2) evidence of Bensayah's history of travel "between and among countries using false passports in multiple names"; and (3) evidence creating "sufficient doubt as to Bensayah's credibility." *Id.*

Having deemed the allegations about Bensayah in the classified document reliable, the district court held "the Government has established by a preponderance of the evidence that it is more likely than not ... Bensayah not only planned to take up arms against the United States but also [planned to] facilitate the travel of unnamed others to do the same." *Id.* The court further held such planning and facilitating "amounts to 'support' within the meaning of the 'enemy combatant' definition governing this case." *Id.* Because it held Bensayah's detention was lawful based upon his support of al Qaeda, the court did not go on to consider whether he was a "member" of al Qaeda or whether his detention was lawful on the alternative ground that he was "part of" that organization.

There have been three developments since the district court's decision. First, the Government has eschewed reliance upon a portion of the evidence that the "senior al-Qaida facilitator" with whom Bensayah allegedly had contact was in fact a senior al Qaeda facilitator. Second, the Government has changed its position concerning the source and scope of its authority to detain Bensayah. Whereas the Government had previously claimed authority to detain Bensayah based upon both the AUMF and the President's constitutional authority as Commander in Chief, it now relies solely upon the AUMF.[*] Third, the Government has abandoned its argument that Bensayah is being detained lawfully because of the support he rendered to al Qaeda — the sole basis upon which the district court denied Bensayah's petition. The Government now contends that Bensayah's detention is lawful only because he was "part of" al Qaeda.

## II. Analysis

Some but not all Bensayah's many arguments on appeal were mooted when the Government abandoned its theory that Bensayah's detention is lawful because he rendered support to al Qaeda. As for matters of procedure, Bensayah still challenges the district court's (1) reliance upon the preponderance of the evidence standard, (2) refusal to require the Government to search for reasonably available exculpatory evidence in its possession, (3) denial of his

---

[*] The Government has also abandoned the term "enemy combatant" in reference to the scope of its detention authority and now claims the authority to detain individuals who "were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces."

discovery requests, and (4) admission of the Government's "rebuttal" evidence. As for matters of substance, Bensayah still argues the district court erred in (1) adopting an overbroad definition of the Executive's detention authority, and (2) crediting "inadequately corroborated raw intelligence." Even if that evidence is credited, he argues (3) it is insufficient to establish his detention is lawful.

We review de novo the district court's conclusions of law, including its ultimate denial of a writ of habeas corpus. *Saunders v. Senkowski*, 587 F.3d 543, 547 (2d Cir. 2009). We review its factual determinations for clear error, *id.*, and its evidentiary rulings for abuse of discretion, *Al Odah v. United States*, 559 F.3d 539, 544 (D.C. Cir. 2009). Whether a detainee was "part of" al Qaeda is a mixed question of law and fact. *Awad v. Obama*, No. 09-5351, slip op. at 17 (June 2, 2010). "That is, whether a detainee's alleged conduct ... justifies his detention under the AUMF is a legal question. The question whether the [G]overnment has proven that conduct ... is a factual question that we review for clear error." *Barhoumi v. Obama*, No. 09-5383, slip op. at 12–13 (June 11, 2010) (internal citation deleted).

A. Standard of Proof

In *Boumediene* the Supreme Court held detainees at Guantanamo Bay are entitled to "the fundamental procedural protections of habeas corpus," 128 S. Ct. at 2277, but did not expand upon which procedural protections are "fundamental." It left open, for instance, the standard of proof the Government must meet in order to defeat a petition for habeas corpus. *Id.* at 2271 ("The extent of the showing required of the Government in these cases is a matter to be determined"). Bensayah argues that because he is liable to be held "for the duration of hostilities that may last a generation or more,"

requiring the Government to prove the lawfulness of his detention by a mere preponderance of the evidence is inappropriate. He contends the district court should have required the Government to prove its case beyond a reasonable doubt, or at least by clear and convincing evidence. This argument has been overtaken by events, for we have recently held a standard of proof higher than a preponderance of the evidence is not a "fundamental procedural protection" of habeas required by *Boumediene. Awad*, slip op. at 18 ("A preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF"); *Al-Bihani v. Obama*, 590 F.3d 866, 878 (2010) ("Our narrow charge is to determine whether a preponderance standard is unconstitutional. Absent more specific and relevant guidance, we find no indication that it is.").

B. Challenges to the Discovery Process

The CMO requires the Government to

provide on an ongoing basis any evidence contained in the material [it] reviewed in developing the return for the petitioner, and in preparation for the hearing for the petitioner, that tends materially to undermine the Government's theory as to the lawfulness of the petitioner's detention.

Bensayah argues the district court abused its discretion by imposing upon the Government an impermissibly narrow obligation to disclose exculpatory evidence. He maintains the Government must search all "reasonably available" information and disclose not only information that "tends materially to undermine the Government's theory as to the lawfulness of the petitioner's detention" but also information that "undermines the reliability of other purportedly

inculpatory evidence" or "names potential witnesses capable of providing material evidence."

Bensayah does not contend the disclosure requirement imposed by the district court is in any way unconstitutional. Nor has he shown that broader disclosure is required by any opinion of the Supreme Court or of this court. He cites *Bismullah v. Gates*, 503 F.3d 137, 138–39 (D.C. Cir. 2007), for the proposition that the Government must search all "reasonably available" information, but that decision was compelled by the terms of a statutory scheme not at issue here. He cites *Al Odah*, 559 F.3d at 546, for the proposition that evidence may be material even if it is not directly exculpatory. The CMO is not, however, in tension with *Al Odah*. Information that undermines the reliability of other materials, *e.g.*, inculpatory evidence, *see id.* at 546, also tends "materially to undermine the Government's theory as to the lawfulness of the petitioner's detention" and hence must be disclosed by the Government. We therefore agree with the Government that the standard for disclosure ordered by the district court, coupled with the opportunity to make specific discovery requests, is consistent with the Supreme Court's directive in *Boumediene* that a detainee be provided with the opportunity to challenge "the sufficiency of the Government's evidence" and to "supplement the record on review" with additional "exculpatory evidence." 128 S. Ct. at 2270, 2274.

Bensayah's primary concern seems to be that the disclosure requirement allows the Government to withhold exculpatory evidence because personnel from other agencies will pass only inculpatory evidence on to the attorneys actually "developing the return" and "preparing for the hearing." That practice is not permissible, however, under the current disclosure requirement. Any information that has been strategically filtered out of the record in order to

withhold exculpatory evidence is plainly "material reviewed in developing the return" — and hence subject to the disclosure requirement — even if the individual doing the filtering works for a Government agency other than the Department of Justice.

Bensayah next argues that the district court erred by placing upon him the burden of explaining why each of his discovery requests would be neither "unfairly disruptive [nor] unduly burdensome to the Government." The district court did not abuse its discretion in structuring discovery this way. The Supreme Court specifically recognized the district court's discretion to accommodate the Government's legitimate interest in protecting sources and intelligence-gathering methods, acknowledging that "[c]ertain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ." *Boumediene*, 128 S. Ct. at 2276. It is not necessary to address Bensayah's specific discovery requests relating to ███████ because, as explained below, we hold this exhibit may not be relied upon by the district court on remand in the absence of additional corroborative evidence. Any discovery requests pertaining to new corroborative evidence should be decided by the district court in the first instance. Finally, we find no merit in Bensayah's claims the district court abused its discretion in denying his request for discovery into the treatment of ███████ or in allowing the Government to present "rebuttal" evidence.

C. Standard of Detention

The Government asserts the authority to detain Bensayah pursuant to the AUMF, in which the Congress authorized the President

to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

As mentioned before, the Government contends it may lawfully detain an individual if he is "part of" al Qaeda. Bensayah objects to this formulation, but we have made clear elsewhere that the AUMF authorizes the Executive to detain, at the least, any individual who is functionally part of al Qaeda. *Barhoumi*, slip op. at 29 (detainee "was 'part of' an al-Qaida-associated force and therefore properly detained pursuant to the AUMF"); *Awad*, slip op. at 19 ("Once [a petitioner is shown to be] 'part of' al Qaeda ... the requirements of the AUMF [are] satisfied"); *Al-Bihani*, 590 F.3d at 872–74.

Although it is clear al Qaeda has, or at least at one time had, a particular organizational structure, *see* The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States 56 (2004) ("[Al Qaeda's] structure included as its operating arms an intelligence component, a military committee, a financial committee, a political committee, and a committee in charge of media affairs and propaganda"), the details of its structure are generally unknown, *see* Audrey Kurth Cronin, Congressional Research Service Report for Congress: Al Qaeda After the Iraq Conflict (2003) ("There is a great deal that remains unknown or debatable about the specific nature, size, structure and reach of [al Qaeda]"), but it is thought to be somewhat amorphous, Kenneth Katzman, Congressional

Research Service Report for Congress: Al Qaeda: Profile and Threat Assessment (2005) ("Al Qaeda has always been more a coalition of different groups than a unified structure, many argue, and it has been this diversity that gives Al Qaeda global reach"). As a result, it is impossible to provide an exhaustive list of criteria for determining whether an individual is "part of" al Qaeda. That determination must be made on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization. That an individual operates within al Qaeda's formal command structure is surely sufficient but is not necessary to show he is "part of" the organization; there may be other indicia that a particular individual is sufficiently involved with the organization to be deemed part of it, *see Awad*, slip op. at 19 ("there are ways other than making a 'command structure' showing to prove that a detainee is 'part of' al Qaeda"), but the purely independent conduct of a freelancer is not enough.

D. Sufficiency of the Evidence

As the district court noted, a ████████████████████ ████████████████████ is the only evidence directly suggesting that Bensayah is an al Qaeda facilitator. That document, ████████████████████ ████████████, contains the warning "INFORMATION REPORT, NOT FINALLY EVAULATED INTELLIGENCE." ████████████████ ████████████████████ ████████████████

████████████ contains a number of allegations about Bensayah. It states:

████████████████████ ████████████████████



The district court, quoting *Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008), correctly stated that it must "evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *See Barhoumi*, slip op. at 21 ("we agree ... *Parhat* sets the guideposts for our inquiry into the reliability of the ... evidence [in a detainee's habeas case]"). Although the district court found ███████ contains some inherent indicia of reliability, *viz.*, ████████████████████████████████ uncertainty about the source of the document and about how the

14

information therein was gathered led the court to conclude ████████ is not by itself reliable.

In *Parhat* we made clear that the reliability of evidence can be determined not only by looking at the evidence alone but, alternatively, by considering "sufficient additional information ... permit[ting the factfinder] to assess its reliability." 532 F.3d at 849. Here the district court, after looking at additional information, concluded "there is sufficient corroborating evidence in the record to credit and rely upon the[] assertions made in ████████ about Bensayah." The evidence in question is of three sorts: (1) evidence linking Bensayah to al Qaeda, and specifically to ████████, allegedly a "senior al-Qaida operative and facilitator"; (2) evidence of Bensayah's travel plans and travel history; and (3) evidence raising "questions ... about Bensayah's whereabouts in the early 1990s," which evidence created "sufficient doubt as to Bensayah's credibility."

Bensayah argues the district court clearly erred by finding ████████ reliable. He contends the ████████ ████████ upon which the district court relied were categorically insufficient to corroborate ████████ ████████. We disagree with Bensayah's broad contention that two pieces of evidence, each unreliable when viewed alone, cannot ever corroborate each other. *Cf. United States v. Laws*, 808 F.2d 92, 100–03 (D.C. Cir. 1986) (relying upon one informant's hearsay statement to corroborate another informant's hearsay statement even though neither was reliable standing alone). We agree, however, with his alternative argument that even if the additional evidence relied upon by the district court in this case is itself reliable, it is not sufficiently corroborative to support reliance upon the statements concerning Bensayah in ████████.

*1. Evidence Linking Bensayah to Al Qaeda*

The district court found ███████████████ were corroborated by Bensayah's "connections" to al Qaeda, *viz.*, (1) Bensayah was directly linked to ████████, allegedly a "senior al-Qaida operative and facilitator," and (2) ████████████████████████ ████████

Evidence linking Bensayah to ████████ included ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████. The district court found the Government "has put forth more than sufficient credible evidence that ████████ was a senior al-Qaida operative and facilitator." Since the district court's decision, however, the Government has eschewed reliance upon much of that evidence; it now maintains the other evidence upon which the district court relied is sufficient to link ████████ to al Qaeda. In an order denying a Rule 60(b) motion filed by Bensayah, the district court indicated it would have concluded ████████ was sufficiently corroborated to be relied upon, even "putting aside completely any evidence linking Bensayah to ██ ████████

Assuming, as the Government contends, ████████ was connected to al Qaeda, the evidence linking Bensayah to ████████ and al Qaeda does not, by itself or together

---

████████████████████████████████████ ████████████████████████████████████ ████████████████

with the other evidence discussed below, corroborate ███ ███ sufficiently so that it can be relied upon. The Government presented no direct evidence of actual communication between Bensayah and any al Qaeda member, much less evidence suggesting Bensayah communicated with ██████████ or anyone else in order to facilitate travel by an al Qaeda member. Indeed, the district court determined the record did not support the allegations in ██████████ concerning the only individuals named therein whose travel Bensayah allegedly planned to facilitate.

### 2. Travel History and Travel Plans

The district court found the assertions in ██████████ were corroborated by evidence that Bensayah (1) ██ ██████████████████████, and (2) had "experience in obtaining and traveling in and out of numerous countries on fraudulent passports." Bensayah admits to having used multiple travel documents, "some of which were in an assumed name," but maintains he traveled under fraudulent documents in order to avoid being sent back to Algeria, "where he reasonably feared persecution." He presented "unrebutted declarations" that "mere possession and use of false travel documents is neither proof of involvement with terrorism nor evidence of facilitation of travel by others." We agree. That Bensayah had experience with fraudulent travel documents ████████████████████████████ ████████ is not sufficiently corroborative of ████████ ████████ that Bensayah was a travel facilitator for al Qaeda or anyone else. As noted in the prior paragraph, the district court determined the Government had failed to show that Bensayah's co-petitioners planned to travel to Afghanistan in order to engage U.S. forces. Therefore, Bensayah could not have been facilitating their travel for that purpose.

### 3. Evidence Calling into Question Bensayah's Credibility

The district court found "serious questions [had] been raised about Bensayah's whereabouts in the early 1990s." This finding at most undermines Bensayah's own credibility; no account of his whereabouts ties him to al Qaeda or suggests he facilitated anyone's travel during that time. These "questions" in no way demonstrate that Bensayah had ties to and facilitated travel for al Qaeda in 2001.

\* \* \*

Because the evidence, viewed in isolation or together, is insufficiently corroborative of ████████, the district court on remand may not, in the absence of additional corroborative evidence not already considered, rely upon that exhibit in determining whether Bensayah was part of al Qaeda.

### III. Conclusion

The Government argues it is authorized by the AUMF to detain Bensayah solely on the ground he was functionally a member or "part of" al Qaeda. The evidence upon which the district court relied in concluding Bensayah "supported" al Qaeda is insufficient, however, to show he was part of that organization. Accordingly, we reverse the judgment of the district court and remand the case for the district court to hear such evidence as the parties may submit and to decide in the first instance whether Bensayah was functionally part of al Qaeda.

*So ordered.*