# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 17, 2010      Decided November 5, 2010

No. 10-5087

MOHAMMEDOU OULD SALAHI, DETAINEE, GUANTANAMO BAY
NAVAL STATION AND YAHDIH OULD SALAHI, AS NEXT FRIEND
OF MOHAMMEDOU OULD SALAHI,
APPELLEES

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00569)

———

*August E. Flentje*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Douglas N. Letter* and *Robert M. Loeb*, Attorneys.

*Theresa M. Duncan* argued the cause for appellees. With her on the brief were *Nancy Hollander*, *Jonathan L. Hafetz*, *Melissa A. Goodman*, *Linda Moreno*, and *Arthur B. Spitzer*.

*Emily Berman* was on the brief for *amicus curiae* Non-Governmental Organizations Brennan Center for Justice and

Reprieve in support of appellees. *Walter Dellinger* entered an appearance.

*David R. Berz* was on the brief for *amicus curiae* National Association of Criminal Defense Lawyers in support of appellees. *Blair G. Brown* entered an appearance.

Before: SENTELLE, *Chief Judge*, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case is more than merely the latest installment in a series of Guantanamo habeas appeals. The United States seeks to detain Mohammedou Ould Salahi on the grounds that he was "part of" al-Qaida not because he fought with al-Qaida or its allies against the United States, but rather because he swore an oath of allegiance to the organization, associated with its members, and helped it in various ways, including hosting its leaders and referring aspiring jihadists to a known al-Qaida operative. After an evidentiary hearing at which Salahi testified, the district court found that although Salahi "was an al-Qaida sympathizer" who "was in touch with al-Qaida members" and provided them with "sporadic support," the government had failed to show that he was in fact "part of" al-Qaida at the time of his capture. The district court thus granted the writ and ordered Salahi released. Since then, however, this Court has issued three opinions—*Al-Adahi v. Obama*, 613 F.3d 1102 (D.C. Cir. 2010); *Bensayah v. Obama*, 610 F.3d 718 (D.C. Cir. 2010); and *Awad v. Obama*, 608 F.3d 1 (D.C. Cir. 2010)—that cast serious doubt on the district court's approach to determining whether an individual is "part of" al-Qaida. We agree with the government that we must therefore vacate the district court's judgment, but because that court, lacking the benefit

of these recent cases, left unresolved key factual questions necessary for us to determine as a matter of law whether Salahi was "part of" al-Qaida when captured, we remand for further proceedings consistent with this opinion.

## I.

Enacted just seven days after the September 11 terrorist attacks, the Authorization for Use of Military Force (AUMF) empowers the President of the United States to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note). We have held that the "necessary and appropriate force" authorized by the AUMF includes the power to detain individuals who are "part of" al-Qaida, the organization that perpetrated the September 11 attacks. *See Bensayah*, 610 F.3d at 724–25. Although the government previously claimed authority to detain Salahi on other grounds as well—because he allegedly aided the September 11 attacks and because he "purposefully and materially support[ed]" forces associated with al-Qaida "in hostilities against U.S. Coalition partners," *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010)—it has since dropped those claims and now relies solely on the allegation that Salahi was "part of" al-Qaida at the time of his capture.

In the district court, the government relied heavily on statements Salahi made to interrogators. *Salahi v. Obama*, 710 F. Supp. 2d 1, 4 (D.D.C. 2010). Conceding, however, that those interrogators had "mistreat[ed]" Salahi from mid-

June to September 2003, the government declined to rely on any statements Salahi made during that period. Appellants' Opening Br. 52; *see also* Staff of S. Comm. on Armed Services, 110th Cong., *Inquiry into the Treatment of Detainees in U.S. Custody* xxii, 135–43 (Comm. Print 2008); A.T. Church, III, *Review of Department of Defense Detention Operations and Detainee Interrogation Techniques* 159–74 (2005); U.S. Dep't of Justice Office of the Inspector Gen., *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq* xxvii, 122–29, 190, 197–99, 295–302 (2008); Jess Bravin, *The Conscience of the Colonel*, Wall St. J., Mar. 31, 2007, at A1. Although the district court formally received all evidence offered by the government, the taint of the "extensive and severe mistreatment" that Salahi suffered led the court to accord little weight to any of Salahi's statements that lacked independent corroboration. *Salahi*, 710 F. Supp. 2d at 6; *see also* Hr'g Tr. at 644:19–24 (Dec. 15, 2009). The government complains that the district court improperly failed to credit certain of Salahi's statements, but because this issue is largely irrelevant to the legal questions we address in this opinion, we present the facts as found by the district court, supplementing with citations to the record only as necessary to provide context for the parties' arguments.

Mohammedou Ould Salahi was born in 1970 in Mauritania. In December 1990, he traveled from Germany, where he was attending college, to Afghanistan "to support the mujahideen"—Islamic rebels seeking to overthrow Afghanistan's Soviet-supported Communist government. Salahi Am. Decl. ¶ 5. While in Afghanistan, Salahi attended a training camp run by al-Qaida, which organized and funded efforts by foreign volunteers to assist the resistance movement. *See* John Rollins, Cong. Research Serv., R41070, *Al Qaeda and Affiliates: Historical Perspective, Global*

*Presence, and Implications for U.S. Policy* 3–4 (2010). Although the United States denies having supported al-Qaida directly, it acknowledges that it provided significant economic and military support to the Afghan mujahideen from approximately 1981 to 1991. *Id.* at 4.

In March 1991, shortly after finishing his training, Salahi swore *bayat*, an oath of loyalty, to al-Qaida. He left Afghanistan soon after taking this oath but returned in January 1992. Having "heard rumors that the mujahideen had invaded Kabul and started fighting among themselves," Salahi decided to travel back to Germany in March 1992. Salahi Am. Decl. ¶ 11. At this point, he alleges, he "severed all ties with . . . al Qaida." *Id.* ¶ 12.

According to the government, however, the record contains significant evidence that Salahi recruited for al-Qaida and provided it with other support after his alleged withdrawal in 1992. For example, the district court found that Salahi sent a fax to al-Qaida operative Christopher Paul in January 1997, asking for his help in finding "a true Group and Place" for "some Brothers" interested in fighting jihad. *Salahi*, 710 F. Supp. 2d at 11 (quoting Salahi's fax to Paul). Salahi admitted to interrogators that he knew Paul to be a "man of great respect in Al-Qaida" and that he sent the fax to "facilitate getting the [aspiring jihadists] to fight." *Id.* (internal quotation marks omitted).

As the district court recognized, "[t]he most damaging allegation against Salahi is that, in October 1999, he encouraged Ramzi bin al-Shibh, Marwan al-Shehhi, and Ziad Jarrah to join al-Qaida." *Id.* at 10. Bin al-Shibh helped coordinate the September 11 attacks, and al-Shehhi and Jarrah were two of the September 11 pilots. Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report*

225, 434–35, 437 (2004) [hereinafter *9/11 Commission Report*]. The government contends that while bin al-Shibh, al-Shehhi, and Jarrah had originally intended to travel to Chechnya to wage jihad against Russian forces, Salahi convinced them to travel instead to Afghanistan to receive military training. According to the government, the three men followed Salahi's advice and with his assistance traveled to Afghanistan, where they were recruited by al-Qaida into the September 11 plot. But the district court, having discounted portions of the government's evidence as unreliable and inconsistent, found only that "Salahi provided lodging for three men for one night at his home in Germany, that one of them was Ramzi bin al-Shibh, and that there was discussion of jihad and Afghanistan." *Salahi*, 710 F. Supp. 2d at 11.

In addition to Salahi's connection to bin al-Shibh, the district court found that Salahi "had an ongoing and relatively close relationship" with Abu Hafs al-Mauritania, who "is believed to be one of [Usama] bin Laden's spiritual advisors and a high-ranking leader of al-Qaida." *Id.* at 12, 14. Abu Hafs is Salahi's cousin and is married to the sister of Salahi's ex-wife. *Id.* at 12–13. In August 1993, Salahi accompanied Abu Hafs to an al-Qaida safe house in Mauritania. *Id.* at 8. Several years later, Abu Hafs asked Salahi to meet with Abu Hajar al-Iraqi, allegedly al-Qaida's telecommunications chief, when al-Iraqi visited Germany in late 1995 and early 1996 to explore purchasing telecommunications equipment for al-Qaida operations in Sudan. *Id.* at 8, 12. At the evidentiary hearing in the district court, Salahi testified that his involvement with al-Iraqi was limited to discussing the telecommunications equipment al-Iraqi planned to purchase and to driving him to various locations. Hr'g Tr. at 551:15–22 (Dec. 15, 2009).

The record contains evidence of additional contacts with Abu Hafs. For example, in December 1997, and then again in December 1998, Salahi transferred $4,000 to Mauritania for Abu Hafs, but the district court noted that "the government relie[d] on nothing but Salahi's uncorroborated, coerced statements" to tie these money transfers to al-Qaida. *Salahi*, 710 F. Supp. 2d at 14. Also, around November 1999, Abu Hafs encouraged Salahi to return to Afghanistan, sending him money and two passports. *Id.* at 13. Although Salahi declined his cousin's invitation, he retained the passports for over a year. Salahi eventually gave one of the passports to his ex-wife, presumably to return to her sister, the passport's owner. He gave the other passport directly to its purported owner, Ahmed Mazid, who was introduced to Salahi by Saleh al-Libi, an al-Qaida member from Libya. *Id.* at 13, 15; Hr'g Tr. at 570:13–16 (Dec. 15, 2009). Around the time Abu Hafs sent Salahi the passports, al-Qaida was allegedly seeking to improve Internet connections between Afghanistan and Pakistan. *Salahi*, 710 F. Supp. 2d at 12. The government argued that Salahi's receipt of the two passports corroborated earlier statements he made to interrogators that he was asked to assist with this project, but the district court found only that Salahi's receipt and retention of the passports raised "unanswered questions about the lawfulness of his activities and the nature of his relationship with Abu Hafs." *Id.* at 13.

The government also alleges that Salahi interacted with members of an al-Qaida cell during a brief stay in Montreal, Canada, from November 1999 to January 2000. Although this Montreal al-Qaida cell has been linked to the unsuccessful Millennium Plot to bomb Los Angeles International Airport, the government does not allege that Salahi participated in that effort. *Id.* at 14. Much about Salahi's connections to the Montreal cell remains hazy and disputed, and for its part, the district court concluded that the

government's evidence of Salahi's activities in Canada did not "add [anything] of significance to the proof that Salahi was 'part of' al-Qaida," although the evidence might be sufficient "to support a criminal charge of providing material support" to the organization. *Id.* at 15; *see also* 18 U.S.C. § 2339B.

After leaving Canada, Salahi returned to Mauritania, where according to the government he "performed computer activities with a goal of helping al-Qaida." Appellants' Opening Br. 43. For example, Salahi considered creating an Internet discussion group about fighting jihad but dropped the plan after a German al-Qaida operative, Christian Ganczarski, suggested that the discussion group would attract attention from authorities. *Salahi*, 710 F. Supp. 2d at 13. Salahi may also have subscribed to electronic mailing lists through which he received emails discussing cyber-attacks. Two such emails were found on a computer Salahi used at his workplace in Mauritania. *Id.* The computer also contained a third document with instructions on implementing cyber-attacks. *Id.* The district court concluded that although these three documents are "not evidence that Salahi engaged in . . . cyber-attacks," they nonetheless corroborate Salahi's statements to interrogators that "he knew about and had some involvement in planning for denial of service computer attacks." *Id.*

Salahi was captured in Mauritania in November 2001 and has been held at the United States Naval Station at Guantanamo Bay, Cuba, since 2002. In December 2004, Salahi appeared before a Combatant Status Review Tribunal, which concluded that he was lawfully detained. *See Parhat v. Gates*, 532 F.3d 834, 837–41 (D.C. Cir. 2008) (describing the establishment of Combatant Status Review Tribunals and the procedures under which they operate). He then filed the habeas petition that is the subject of this appeal.

In its opinion granting Salahi's petition, the district court began by rejecting the government's argument that because Salahi had once sworn *bayat* to al-Qaida, the burden should shift to him to prove that he later withdrew from the organization. *Salahi*, 710 F. Supp. 2d at 6. After reviewing all the evidence, the district court then concluded that Salahi "was an al-Qaida sympathizer" and "perhaps a 'fellow traveler.' " *Id.* at 16. It also found that Salahi "was in touch with al-Qaida members" and provided them with "sporadic support." *Id.* Nonetheless, the court concluded, Salahi was not "part of" al-Qaida at the time of his capture because the government had failed to prove that after leaving Afghanistan in 1992, he continued receiving and executing orders within al-Qaida's "command structure." *Id.* at 5, 15–16.

The government appeals. We review the district court's factual findings for clear error. *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010). Legal questions, including the ultimate determination of whether the facts found by the district court establish that Salahi was "part of" al-Qaida, are reviewed *de novo*. *Id.*

## II.

Before considering the government's arguments, we think it important to emphasize the precise nature of the government's case against Salahi. The government has not criminally indicted Salahi for providing material support to terrorists or the "foreign terrorist organization" al-Qaida. *See* 18 U.S.C. §§ 2339A, 2339B; *see also Salahi*, 710 F. Supp. 2d at 16 ("The government's problem is that its proof that Salahi gave material support to terrorists is so attenuated, or so tainted by coercion and mistreatment, or so classified, that it cannot support a successful criminal prosecution."). Nor does the government seek to detain Salahi under the AUMF on the

grounds that he aided the September 11 attacks or "purposefully and materially support[ed]" forces associated with al-Qaida "in hostilities against U.S. Coalition partners." *Al-Bihani*, 590 F.3d at 872. Instead, the government claims that Salahi is detainable under the AUMF because he was "part of" al-Qaida when captured. *See* Hr'g Tr. at 646:5–6 (Dec. 15, 2009) ("[I]t's the government's position that *at the time of capture*, [the] detainee must be part of al-Qaeda." (emphasis added)).

Reiterating the argument it made in the district court, the government contends that Salahi should bear the burden of proving that he disassociated from al-Qaida after swearing *bayat* to the organization in 1991. In support, the government cites the plurality's statement in *Hamdi v. Rumsfeld* that "once the Government puts forth credible evidence that [a] habeas petitioner meets the [AUMF's detention] criteria, the onus [may] shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria." 542 U.S. 507, 534 (2004).

Here, as noted, the relevant inquiry is whether Salahi was "part of" al-Qaida when captured. Therefore, in order to shift the burden of proof to Salahi, we would have to presume that having once sworn *bayat* to al-Qaida, Salahi remained a member of the organization until seized in November 2001. Although such a presumption may be warranted in some cases, such as where an individual swore allegiance to al-Qaida on September 12, 2001, and was captured soon thereafter, the unique circumstances of Salahi's case make the government's proposed presumption inappropriate here.

When Salahi took his oath of allegiance in March 1991, al-Qaida and the United States shared a common objective: they both sought to topple Afghanistan's Communist

government. *See* Rollins, *supra*, at 4. Not until later did al-Qaida begin publicly calling for attacks against the United States. *See id.* at 4–5; *see also 9/11 Commission Report*, *supra*, at 59. To be sure, the roots of the conflict between al-Qaida and the United States stretch back at least as far as Iraq's August 1990 invasion of Kuwait, following which Saudi Arabian leaders allowed U.S. forces to deploy to their country. Rollins, *supra*, at 5. Usama bin Laden was immediately critical of this arrangement, "paint[ing] the U.S. forces as occupiers of sacred Islamic ground," and after leaving Saudi Arabia in April 1991, he relocated to Sudan and began "buying property there which he used to host and train Al Qaeda militants . . . for use against the United States and its interests, as well as for *jihad* operations in the Balkans, Chechnya, Kashmir, and the Philippines." *Id.*; *see also 9/11 Commission Report*, *supra*, at 57. Bin Laden, however, did not issue his first *fatwa* against U.S. forces until 1992—the very year in which, according to Salahi's sworn declaration, Salahi severed all ties with al-Qaida. *See 9/11 Commission Report*, *supra*, at 59; Salahi Am. Decl. ¶ 12. In light of all this, Salahi's March 1991 oath of *bayat* is insufficiently probative of his relationship with al-Qaida at the time of his capture in November 2001 to justify shifting the burden to him to prove that he disassociated from the organization. In so concluding, we have no doubt about the relevance of Salahi's oath to the ultimate question of whether he was "part of" al-Qaida at the time of his capture. We conclude only that given the facts of this particular case, Salahi's oath does not warrant shifting the burden of proof.

The government next challenges the district court's use of the "command structure" test—a standard that district judges in this circuit, operating without any meaningful guidance from Congress, developed to determine whether a Guantanamo habeas petitioner was "part of" al-Qaida. *See*

*Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 (D.D.C. 2009); *Gherebi v. Obama*, 609 F. Supp. 2d 43, 68–69 (D.D.C. 2009). As applied by the district court in this case, the command-structure test required the government to prove that Salahi " 'receive[d] and execute[d] orders or directions' " from al-Qaida operatives after 1992 when, according to Salahi, he severed ties with the organization. *Salahi*, 710 F. Supp. 2d at 5 (quoting *Hamlily*, 616 F. Supp. 2d at 75). Having found no such evidence, the court concluded that Salahi was not "part of" al-Qaida at the time of his capture. *Id.* at 15–16.

As the government points out, the district court's approach is inconsistent with our recent decisions in *Awad* and *Bensayah*, which were issued after the district court granted Salahi's habeas petition. These decisions make clear that the determination of whether an individual is "part of" al-Qaida "must be made on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization." *Bensayah*, 610 F.3d at 725. Evidence that an individual operated within al-Qaida's command structure is "sufficient but is not necessary to show he is 'part of' the organization." *Id.*; *see also Awad*, 608 F.3d at 11. "[T]here may be other indicia that a particular individual [was] sufficiently involved with the organization to be deemed part of it." *Bensayah*, 610 F.3d at 725. For example, since petitioner in *Awad* joined and was accepted by al-Qaida fighters who were engaged in hostilities against Afghan and allied forces, he could properly be considered "part of" al-Qaida even if he never formally received or executed any orders. *See Awad*, 608 F.3d at 3–4, 11.

As we explained in *Bensayah*, however, "the purely independent conduct of a freelancer is not enough" to establish that an individual is "part of" al-Qaida. 610 F.3d at

725. Thus, as government counsel conceded at oral argument, the government's failure to prove that an individual was acting under orders from al-Qaida may be *relevant* to the question of whether the individual was "part of" the organization when captured. *See* Oral Arg. Tr. at 20:17–21:5. Consider this very case. Unlike petitioner in *Awad*, who affiliated with al-Qaida fighters engaged in active hostilities against U.S. allies in Afghanistan, Salahi is not accused of participating in military action against the United States. Instead, the government claims that Salahi was "part of" al-Qaida because he swore *bayat* and thereafter provided various services to the organization, including recruiting, hosting leaders, transferring money, etc. Under these circumstances, whether Salahi performed such services pursuant to al-Qaida orders may well be relevant to determining if he was "part of" al-Qaida or was instead engaged in the "purely independent conduct of a freelancer." *Bensayah*, 610 F.3d at 725. The problem with the district court's decision is that it treats the absence of evidence that Salahi received and executed orders as dispositive. *See Salahi*, 710 F. Supp. 2d at 5–6, 11–12, 15–16. The decision therefore cannot survive *Awad* and *Bensayah*.

The government urges us to reverse and direct the district court to deny Salahi's habeas petition. Although we agree that *Awad* and *Bensayah* require that we vacate the district court's judgment, we think the better course is to remand for further proceedings consistent with those opinions. Because the district court, lacking the guidance of these later decisions, looked primarily for evidence that Salahi participated in al-Qaida's command structure, it did not make definitive findings regarding certain key facts necessary for us to determine as a matter of law whether Salahi was in fact "part of" al-Qaida when captured. *See Barhoumi*, 609 F.3d at 423 (noting that whether the facts found by the district court are

sufficient to establish that an individual was "part of" al-Qaida is a legal question that we review *de novo*). For example, does the government's evidence support the inference that even if Salahi was not acting under express orders, he nonetheless had a tacit understanding with al-Qaida operatives that he would refer prospective jihadists to the organization? *See Salahi*, 710 F. Supp. 2d at 10–12. Has the government presented sufficient evidence for the court to make findings regarding what Salahi said to bin al-Shibh during their "discussion of jihad and Afghanistan"? *Id.* at 11. Did al-Qaida operatives ask Salahi to assist the organization with telecommunications projects in Sudan, Afghanistan, or Pakistan? *See id.* at 12–13. Did Salahi provide any assistance to al-Qaida in planning denial-of-service computer attacks, even if those attacks never came to fruition? *See id.* at 13. May the court infer from Salahi's numerous ties to known al-Qaida operatives that he remained a trusted member of the organization? *See id.* at 16 ("Salahi . . . associated with at least a half-dozen known al-Qaida members and terrorists[] and somehow found and lived among or with al-Qaida cell members in Montreal."); *cf. Awad*, 608 F.3d at 3 (noting that the al-Qaida fighters Awad joined "treated [him] as one of their own"). With answers to questions like these, which may require additional testimony, the district court will be able to determine in the first instance whether Salahi was or was not "sufficiently involved with [al-Qaida] to be deemed part of it." *Bensayah*, 610 F.3d at 725.

A final note: since we are remanding for further factual findings, we think it appropriate to reiterate this Court's admonition in *Al-Adahi*, also decided after the district court issued its decision in this case, that a court considering a Guantanamo detainee's habeas petition must view the evidence collectively rather than in isolation. 613 F.3d at 1105–06. Merely because a particular piece of evidence is

insufficient, standing alone, to prove a particular point does not mean that the evidence "may be tossed aside and the next [piece of evidence] may be evaluated as if the first did not exist." *Id.* at 1105. The evidence must be considered in its entirety in determining whether the government has satisfied its burden of proof.

Although the district court generally followed this approach, its consideration of certain pieces of evidence may have been unduly atomized. For example, the court found that Salahi's "limited relationships" with certain al-Qaida operatives were "too brief and shallow to serve as an *independent* basis for detention." *Salahi*, 710 F. Supp. 2d at 15 (emphasis added). Even if Salahi's connections to these individuals fail independently to prove that he was "part of" al-Qaida, those connections make it more likely that Salahi was a member of the organization when captured and thus remain relevant to the question of whether he is detainable. *Cf. Al-Adahi*, 613 F.3d at 1107 (noting that petitioner's "close association [with Usama bin Laden] made it far more likely that [he] was or became part of" al-Qaida).

The district court may also have evaluated Salahi's oath of *bayat* in isolation. In its conclusion, the district court stated, "[T]he government wants to hold Salahi indefinitely, because of its concern that he might *renew* his oath to al-Qaida and become a terrorist upon his release." *Salahi*, 710 F. Supp. 2d at 16 (emphasis added). This suggests that the district court may have failed to consider the possibility that the "sporadic support" Salahi "undoubtedly . . . provide[d]" al-Qaida demonstrates that he remained a member of the organization, thus having no need to renew his oath because he continued to abide by his original vow of allegiance. *Id.* at 15–16.

## III.

The President seeks to detain Salahi on the grounds that he was "part of" al-Qaida at the time he was captured. Because additional fact-finding is required to resolve that issue under this circuit's evolving case law, we vacate and remand for further proceedings consistent with this opinion.

*So ordered.*