# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 24, 2011

Decided April 27, 2012
Reissued May 3, 2012

No. 11-5081

MASHOUR ABDULLAH MUQBEL ALSABRI,
PETITIONER-APPELLANT

v.

BARACK OBAMA, ET AL.,
RESPONDENTS-APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01767)

*Brian J. Neff* argued the cause for appellant. *Donald A. Klein* was on the briefs.

*Michael P. Abate*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Tony West*, Assistant Attorney General, and *Robert M. Loeb*, Attorney.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  Petitioner Mashour Abdullah Muqbel Alsabri, a detainee at the United States Naval Station at Guantanamo Bay, Cuba, appeals the district court's denial of his petition for a writ of habeas corpus.  For the reasons set forth below, we affirm the judgment of the district court.[1]

I

The facts leading to the petitioner's detention are extensively chronicled in the district court's opinion.  *See Alsabri v. Obama*, 764 F. Supp. 2d 60 (D.D.C. 2011).  The following synopsis relies on the district court's most significant findings.

Alsabri is a Yemeni citizen who was born and raised in Saudi Arabia.  He lived in Saudi Arabia until he was deported to Yemen in 1998, following an arrest for allegedly harboring an individual wanted for passport forgery.  In Yemen, he associated with veteran jihadist fighters, including members of al Qaeda, and decided to travel to Afghanistan to fight with the Taliban or al Qaeda.  In the summer of 2000, he traveled to Afghanistan by way of Pakistan, assisted by the Taliban and in the company of several men who expressed a desire to become martyrs.  Once in Afghanistan, Alsabri stayed at several guesthouses affiliated with the Taliban and al Qaeda.  He actively sought out and received military training from the Taliban or al Qaeda, and thereafter -- with the authorization of one of Osama bin Laden's lieutenants -- traveled to the front lines of the Taliban's fight against the Northern Alliance.

---

[1]All descriptions of facts and events are taken from unclassified or declassified documents and briefs that are on the public record in this case.  There are no redactions from the opinion.

After leaving the front, Alsabri went to Jalalabad, Afghanistan. As Coalition forces approached that city in late 2001, following al Qaeda's September 11, 2001 attacks against the United States, Alsabri fled eastward to a village near the border of Afghanistan and Pakistan. There he says he remained for nearly a month before crossing into Pakistan, where he was captured by Pakistani authorities in early 2002. The Pakistanis turned Alsabri over to the custody of the United States military, and he was subsequently transferred to Guantanamo Bay.

In October 2006, Alsabri filed a petition for a writ of habeas corpus. The petition was held in abeyance until the Supreme Court ruled, in *Boumediene v. Bush*, that aliens detained as enemy combatants at Guantanamo are "entitled to the privilege of habeas corpus to challenge the legality of their detention," 553 U.S. 723, 771 (2008), and that the federal courts have jurisdiction over such challenges, *id*. at 791-92. In November 2010, the district court held a four-day habeas hearing. Following the hearing, the court concluded, based on a preponderance of the evidence, that "the petitioner was part of the Taliban, al-Qaida or associated forces and is therefore lawfully detained." *Alsabri*, 764 F. Supp. 2d at 62; *see id.* at 96. The court based its conclusion on five findings: (1) that Alsabri traveled to Afghanistan for the purpose of fighting with the Taliban or al Qaeda; (2) that once in Afghanistan he stayed at multiple Taliban and al Qaeda guesthouses; (3) that he sought and received military training from the Taliban or al Qaeda; (4) that he traveled to the front lines of the Taliban's battle against the Northern Alliance; and (5) that he remained a part of the Taliban, al Qaeda, or associated forces at the time of his capture.

On appeal, Alsabri raises several challenges to the district court's denial of his habeas petition. First, he disputes certain factual findings by the district court, as well as its ultimate conclusion that he was part of the Taliban, al Qaeda, or

associated forces. Second, he argues that the district court committed procedural error in admitting certain pieces of evidence over his objections. Finally, he maintains that the court's decision rests on several legal errors. We address Alsabri's factual disputes in Part II, his evidentiary objections in Part III, and his legal arguments in Part IV.

II

Following al Qaeda's attacks against the United States, Congress passed the Authorization for Use of Military Force (AUMF), which provides:

> [T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001) (codified at 50 U.S.C. § 1541 note). We have held that the AUMF grants the President the authority "to detain individuals who are 'part of forces associated with Al Qaeda or the Taliban.'" *Khan v. Obama*, 655 F.3d 20, 23 (D.C. Cir. 2011) (quoting *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010)). Applying that standard to the facts of this case, the district court held that "the petitioner was part of the Taliban, al-Qaida or associated forces and is therefore lawfully detained." *Alsabri*, 764 F. Supp. 2d at 62.

The district court's decision denying the writ presents a mixed question of law and fact. *See Khan*, 655 F.3d at 26; *Awad*

*v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010). We review the court's specific factual determinations about what happened -- why Alsabri traveled to Afghanistan, where he stayed, and what he did -- for clear error, *see Khan*, 655 F.3d at 26; *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010), which we may find only if, "'on the entire evidence,' we are 'left with the definite and firm conviction that a mistake has been committed,'" *Barhoumi*, 609 F.3d at 423 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). The "question whether evidence is sufficiently reliable to credit is [also] one we review for clear error." *Al Alwi v. Obama*, 653 F.3d 11, 19 (D.C. Cir. 2011); *see Khan*, 655 F.3d at 26; *Awad*, 608 F.3d at 8. The district court's overall conclusion as to "whether a detainee's alleged conduct is sufficient to make him part of" the Taliban, al Qaeda, or associated forces for purposes of the AUMF, however, is a "legal question[] that we review de novo." *Khan*, 655 F.3d at 26 (internal quotation marks omitted); *see Al Alwi*, 653 F.3d at 16; *Barhoumi*, 609 F.3d at 423.

A

We begin with the district court's determination that Alsabri traveled to Afghanistan for the purpose of fighting with the Taliban or al Qaeda. The court based that determination on four subsidiary findings regarding: (a) Alsabri's association with veteran jihadists while in Yemen; (b) the role of a former Taliban fighter in encouraging Alsabri to travel to Afghanistan; (c) the influence of a fatwa issued by two Saudi clerics; and (d) Alsabri's travel route and travel companions. Alsabri contests various individual pieces of evidence underlying these findings, but he does not dispute the greater part of the evidence on which the district court relied. Indeed, the court's findings are

supported primarily by Alsabri's own admissions, which he has not repudiated.[2]

Alsabri concedes that, at some point before traveling to Afghanistan, he stayed for approximately two weeks at a boardinghouse in Sana'a, Yemen with a group of veteran fighters. At least two of them were members of the Taliban or al Qaeda; one would go on to become one of the suicide bombers of the U.S.S. Cole. *See Alsabri*, 764 F. Supp. 2d at 63, 72-76; Pet'r Br. 8-9. After leaving the boardinghouse, Alsabri maintained relationships with several of those individuals and inquired about the whereabouts of one of them while he was in Afghanistan. *Alsabri*, 764 F. Supp. 2d at 75 (citing GTMO Intelligence Report at 3 (Jan. 10, 2004) (J.A. 818)). Although not dispositive, such "evidence of association with other al Qaeda members is itself probative" of membership in al Qaeda or associated forces. *Uthman v. Obama*, 637 F.3d 400, 405 (D.C. Cir. 2011). Alsabri also admits that two of the primary influences on his decision to travel to Afghanistan were his discussions with a former Taliban fighter who told Alsabri about his military training,[3] and a fatwa issued by two Saudi clerics

---

[2]Alsabri's admissions were recorded in interrogation reports, as to which the district court found "ample evidence . . . to support their reliability." *Alsabri*, 764 F. Supp. 2d at 68. The court observed that the reports were largely based on Alsabri's personal knowledge, that they were "replete with specific details," and that there was "no evidence that any of the statements were elicited through undue coercion." *Id.* The court also noted that many of the admissions upon which it relied were "repeated by the petitioner in multiple interrogations and corroborated by the statements of third-party detainees." *Id.*

[3]Alsabri contends that this individual only encouraged him to go to Afghanistan to find a wife and a job and to enjoy "peace and security." Pet'r Br. 48. The district court reasonably discounted that

who encouraged Islamic men to go to Afghanistan to assist the Taliban. *Alsabri*, 764 F. Supp. 2d at 76-80; *see* Interrogation Report at 3 (Feb. 21, 2002) (J.A. 788); Interrogation Report at 5 (May 24, 2002) (J.A. 803).

Alsabri further states that, upon departing Sana'a, he flew to Karachi, Pakistan, and then traveled on to Quetta, Pakistan, before finally crossing the border into Afghanistan and arriving at a guesthouse in Kandahar. *Alsabri*, 764 F. Supp. 2d at 81 (citing, inter alia, Interrogation Report at 6 (Feb. 21, 2002) (J.A. 791)); *see* Interrogation Report at 5-6 (May 24, 2002) (J.A. 803-04). This is the same route taken by the detainee in the *Uthman* case, which we described as "a common al Qaeda route" that "can be probative evidence that the traveler was part of al Qaeda." 637 F.3d at 405-06; *see Al Odah v. United States*, 611 F.3d 8, 16 (D.C. Cir. 2010). Moreover, while in Quetta, Alsabri stayed at a guesthouse known as the "Daftar al-Taliban," which Alsabri understood was operated by the Taliban. *Alsabri*, 764 F. Supp. 2d at 83 (citing interrogation reports). The district court found that Taliban personnel at that house "arranged for [Alsabri's] entry into Afghanistan." *Id.*

After spending two or three days at Daftar al-Taliban, Alsabri traveled by taxi with three other men to the border of

---

contention, both because there was no credible evidence that Alsabri ever looked for a job or pursued marriage prospects while in Afghanistan, and because it was facially implausible to expect that Afghanistan would provide peace and security in the midst of the ongoing conflict between the Taliban and the Northern Alliance. *Alsabri*, 764 F. Supp. 2d at 77-78. The district court further noted Alsabri's admission that he did not tell anyone, including his family, that he was planning to travel to Afghanistan. *See id.* at 64. As the court said, this lends additional support to the conclusion that he did not travel to Afghanistan for a benign purpose. *Id.* at 78.

Afghanistan. *Id.* at 81. One of them told Alsabri that he was going to Afghanistan for jihad, and all three told him that they intended to become martyrs. *Id.* (citing Interrogation Report at 3 (July 17, 2002) (J.A. 832); Interrogation Report at 2 (July 18, 2002) (J.A. 838)). At the border, the men switched from the taxi to motorcycles because, Alsabri said, motorcycles "were not required to stop at the border." Interrogation Report at 1 (Feb. 27, 2002) (J.A. 808). Then, once inside Afghanistan, the taxi picked the men up again and took them to a guesthouse in Kandahar. *Alsabri*, 764 F. Supp. 2d at 81. As the district court noted, "the elaborate arrangements made by the Taliban office in Quetta to ferry the petitioner across the border without detection by border patrol calls into question the legitimacy" of Alsabri's contention that he was traveling to Afghanistan for a purpose other than to join the Taliban and/or al Qaeda. *Id.*

In light of this evidence, considered as a whole, we find no clear error in the district court's conclusion "that the petitioner traveled to Afghanistan in order to fight with the Taliban, al-Qaida or associated enemy forces." *Id.* at 82. Although such an "intention to fight is inadequate by itself to make someone 'part of'" the Taliban or al Qaeda, "it is nonetheless compelling evidence when . . . it accompanies additional evidence of conduct consistent with an effectuation of that intent." *Awad*, 608 F.3d at 9. As discussed below, the district court properly found that, after entering Afghanistan, Alsabri took further steps consistent with that intent.

B

The district court found that "throughout his time in Afghanistan, the petitioner stayed at multiple guesthouses that he knew were affiliated with al-Qaida and the Taliban." *Alsabri*, 764 F. Supp. 2d at 88. Alsabri does not dispute this finding. *See* Oral Arg. Recording at 2:30-2:45. In light of the evidence that

al Qaeda-associated guesthouses were not generally open to the public, *see* Expert Decl. at 3 (Sept. 19, 2008) (J.A. 870), this court has recognized that staying at such houses can be "powerful" evidence that a detainee was part of al Qaeda and/or the Taliban. *Uthman*, 637 F.3d at 406; *see Almerfedi v. Obama*, 654 F.3d 1, 6 n.7 (D.C. Cir. 2011); *Al-Madhwani v. Obama*, 642 F.3d 1071, 1075 (D.C. Cir. 2011); *Al-Adahi v. Obama*, 613 F.3d 1102, 1108-09 (D.C. Cir. 2010); *Al-Bihani*, 590 F.3d at 873 n.2.

The Kandahar guesthouse where Alsabri stayed after his taxi trip from Pakistan was the Haji Habash house. *Alsabri*, 764 F. Supp. 2d at 83-84. Alsabri concedes that Haji Habash was a Taliban guesthouse operated by an al Qaeda leader, *id.* (citing interrogation reports), and he admits that it served as a staging ground for "'people from different nations'" who "'were there waiting to go on training missions at either [the] Al Farouq or Abu Baida'" training camps, *Alsabri*, 764 F. Supp. 2d at 84 (quoting GTMO Intelligence Report at 2).[4] Alsabri turned over his passport when he arrived, *id.*, which was consistent with "'standard al Qaeda and Taliban operating procedure[]' when checking into an al Qaeda guesthouse in Afghanistan," *Uthman*, 637 F.3d at 406 (quoting *Al Odah*, 611 F.3d at 15). He also admits that, during his stay at Haji Habash, he paid a daily visit to the al Qaeda-affiliated Islamic Institute across the street. *Alsabri*, 764 F. Supp. 2d at 84 (citing interrogation reports). As the district court noted, statements by other Guantanamo detainees confirmed that the "Institute was headed by Abu Hafs al-Mauritania, a senior al-Qaida leader who associated with high-ranking Taliban and al-Qaida leaders." *Id.*; *see Esmail v.*

---

[4] *See also* Expert Decl. at 3 (Sept. 19, 2008) (J.A. 870) (describing the Haji Habash guesthouse as "a Taliban-sponsored guesthouse for Arab mujahedeen in Kandahar"); *id.* (stating that Haji Habash "was used as a transition point and in-processing location for individuals going to train at various training camps, including al-Farouq").

*Obama*, 639 F.3d 1075, 1076 (D.C. Cir. 2011) (describing the Institute as "al Qaeda-affiliated").

After leaving the Haji Habash guesthouse, Alsabri's next stop was a guesthouse in Kabul run by one of Osama bin Laden's lieutenants, Hamza al-Ghamdi. *See Alsabri*, 764 F. Supp. 2d at 85 & n.36 (citing statements by several detainees describing al-Ghamdi's role in al Qaeda). This was an important stop for at least two reasons. First, while at this house, Alsabri observed a visit by Ramsi bin al-Shibh, who has been identified as a coordinator of the September 11 terrorist attacks. *See* Resp'ts Br. 22; *Alsabri*, 764 F. Supp. 2d at 86 (citing Interrogation Report at 5; THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NAT'L COMM'N ON TERRORIST ATTACKS UPON THE UNITED STATES, at 434 (2004)). It is hardly unreasonable to infer that al-Ghamdi would not have allowed a non-affiliated guest to stay at the house during a visit by someone as important to al Qaeda as bin al-Shibh. Second, al-Ghamdi himself played an important role in determining who was to receive military training and in arranging the travel of fighters to the front lines. *See Alsabri*, 764 F. Supp. 2d at 85 & n.36 (citing detainee statements). As we have recognized, a detainee's "voluntary decision to move to an al-Qaida guesthouse, a staging area for recruits heading for a military training camp, makes it more likely -- indeed, very likely -- that [the detainee] was himself a recruit." *Al-Adahi*, 613 F.3d at 1108. Moreover, as discussed below, Alsabri admitted that he repeatedly sought al-Ghamdi's permission to go to the battle lines and eventually succeeded in obtaining his permission during a return visit to al-Ghamdi's house. *Alsabri*, 764 F. Supp. 2d at 85-86.

Taken together, this evidence regarding Alsabri's stays at the Haji Habash and al-Ghamdi guesthouses[5] provides powerful support for the district court's conclusion that Alsabri was "part of" the Taliban or al Qaeda.

C

Alsabri's associations with the Taliban and al Qaeda were not limited to interacting with their members and staying at their guesthouses. Rather, the district court found that Alsabri also actively "sought out and received military-style training from the Taliban or al-Qaida" during his time in Afghanistan. *Alsabri*, 764 F. Supp. 2d at 62. Those findings are not clearly erroneous.

To begin with, the government introduced an English translation of a document appearing to be Alsabri's application to attend an al Qaeda training camp. *Id.* at 89; *see* J.A. 945. According to a March 2002 FBI memorandum, the document was one of several "applications for training at Al Qaeda camps" that Coalition forces recovered from an "'Arab' office in Kandahar, Afghanistan" in December 2001. *Alsabri*, 764 F. Supp. 2d at 89 (citing FBI Memorandum at 1). The document includes an entry listing one of the kunyas, or aliases, that Alsabri used while in Afghanistan, along with biographical details consistent with those of Alsabri's life. *Id.*; *see* J.A. 945. The document also states that the applicant was "referred to the camp" by two individuals, one of whom Alsabri acknowledges was an al Qaeda member he met in Sana'a. *Alsabri*, 764 F. Supp. 2d at 89 (citing J.A. 945). At the conclusion of this entry,

---

[5]The district court also found that, after departing the al-Ghamdi guesthouse for the second time, Alsabri "stayed in at least one other Taliban and al-Qaida guesthouse near the front." *Alsabri*, 764 F. Supp. 2d at 88.

the applicant lists his "'[p]lans after training'" as: "'Jihad.'" *Id.* (quoting J.A. 945).

Alsabri does not dispute that he is the individual referenced in that document. Instead, he argues only that "[t]here was no evidence in the record that the [document] was filled out by [Alsabri], rather than by [a Taliban] recruiter or someone else using information that Alsabri provided." Pet'r Br. 49 n.7. But it is immaterial whether Alsabri filled out the application himself, or simply provided his biographical information to someone who then transcribed it. The important point is that Alsabri provided detailed personal information about himself on a document that indicates his desire to obtain military training for the purpose of engaging in jihad.

In addition to the application document, the government introduced evidence that Alsabri did in fact receive weapons training. The principal evidence was an English-language translation of a 92-page collection of documents that the government maintains were internal Taliban or al Qaeda records. A Defense Intelligence Agency (DIA) record, which the government submitted as a supplemental exhibit, indicates that the documents were captured by Coalition forces from the "Director of Al–Qa'ida Security Training Office," and are "similar to other materials recovered from enemy forces." *Alsabri*, 764 F. Supp. 2d at 90-91 (internal quotation marks omitted). The DIA, which prepared the translation of the documents, describes them as "contain[ing] [t]he names of the students admitted to the training in the tactics of [a]rtillery, communication, infantry and their distribution," as well as the "training starting times, programs, [and] instructions about the subject matters." *Id.* at 91.

The documents include multiple entries that appear to be references to Alsabri: his kunya, for example, appears on a list

of "arriving brothers" in September 2000, along with biographical information that matches the information provided in the application document that Alsabri does not deny refers to him. *See id.* at 91-92; J.A. 989; Resp'ts Br. 34-35. Indeed, at oral argument, counsel for Alsabri conceded that the entry on the "arriving brothers" list also refers to him. Oral Arg. Recording at 15:45-16:15.[6]

The same kunya that appears on the "arriving brothers" list -- or another transliteration thereof -- also appears on a roster of individuals scheduled to attend a "communications class" in February 2001. *Alsabri*, 764 F. Supp. 2d at 91-92; *see* J.A. 975. Another page of the document collection shows that as of August 2001, that individual had "'graduated from Anti Air Missiles'" class. *Alsabri*, 764 F. Supp. 2d at 91 (quoting J.A. 1018). As a consequence, he was to be given "'priorit[y] in joining the Artillery Session[]'" scheduled for the next day. *Id.*

Alsabri contends that the district court erred in concluding that the records of scheduled and completed training refer to him, arguing that the "names that comprise his alleged kunya -- 'Salman' (meaning 'peaceful') and 'al Makki' ('from Mecca') -- are extremely common -- essentially, the Arabic equivalent of 'Bob, from New York.'" Pet'r Br. 50. But the district court did not clearly err in finding that the documents refer to Alsabri. The court carefully canvassed the evidence, noting that the

---

[6]Alsabri does take issue with the district court's reference to this "arriving brothers" list as a "training roster." Pet'r Br. 42. Given the context provided by the remainder of the documents, however, the district court's characterization of the list is not clearly erroneous. But even if the document is "merely a list of guesthouse residents," as Alsabri contends, *id.*, that would not render the district court's finding that he received military training clearly erroneous, for the reasons discussed in the balance of this section.

internal corroboration of the names, dates, and biographical information in the various records "provides substantial evidence of their authenticity and reliability," and that the significant overlap between the documents and Alsabri's statements to interrogators -- including his statements regarding his travel companions, several of whose names or aliases also appear in the training records -- "provide[s] further support" for the government's assertions. *Alsabri*, 764 F. Supp. 2d at 91-92; *cf. Barhoumi*, 609 F.3d at 428 (assessing the reliability of a translated diary "by evaluating the diary's internal coherence as well as its consistency with uncontested record evidence, including [the detainee's] own statements").

To buttress its conclusion that Alsabri received military training, the district court also properly relied on the sequence of Alsabri's requests to travel to the front lines. *Alsabri*, 764 F. Supp. 2d at 92-93. Alsabri told his interrogators that he asked al-Ghamdi for permission to go to the Taliban battle lines at least twice. *Id.* The first time, "Al-Ghamdi denied that request 'since he did not have any weapons training.'" *Id.* at 93 (quoting Interrogation Report at 4). Alsabri then traveled to Jalalabad. After several months there, he "'decided to return to Al Ghamdi's Arab house in Kabul to try and get to the fighting at the front line.'" *Id.* (quoting Interrogation Report at 5). This time, al-Ghamdi "'finally authorized [him] to go to the 2nd line of defense near Bagram.'" *Id.* at 86 (quoting Interrogation Report at 6). In light of this evidence, the district court was not unreasonable in inferring "that between his first and second stays at al-Ghamdi's guesthouse, [Alsabri] remedied the deficiency identified by al-Ghamdi by obtaining weapons training." *Id.* at 93.[7] And, as we have held before, "training at

---

[7]Noting that only one of several interrogation reports mentions the first request to travel to the front, Alsabri's counsel suggests that the report may have been inaccurate -- perhaps "due to a translation

. . . al Qaeda training camps is compelling evidence that the trainee was part of al Qaeda." *Esmail*, 639 F.3d at 1076; *see Al-Madhwani*, 642 F.3d at 1075; *Al-Adahi*, 613 F.3d at 1108; *Al-Bihani*, 590 F.3d at 873 n.2.

D

Alsabri's admission that, with al-Ghamdi's authorization, he traveled to the battle lines of the Taliban's fight against the Northern Alliance just months before his capture also weighs heavily in favor of the conclusion that he was part of the Taliban or al Qaeda. Alsabri "admitted in two separate interrogations that he went to the front *to assist Taliban fighters*." *Alsabri*, 764 F. Supp. 2d at 94 (emphasis added); *see* Interrogation Report at 3 (Feb. 27, 2002) (J.A. 810) ("During the later part of the year, Al-Sabri began traveling to Bagram to assist Taliban fighters in their efforts against the Northern Alliance fighters."); Interrogation Report at 6 (July 17, 2002) (J.A. 835) (stating that he went to the front "to support the Taliban who were positioned to fight [Massoud's] Northern Alliance troops").[8] Although Alsabri did not admit to actively participating in the fighting, he conceded that "there was fighting going on there," and that he

error, or because the interrogators misunderstood what Alsabri said, or because they misread their own notes from the interrogation." Pet'r Br. 26-27. But counsel's speculation cannot alone render reliance on the report unreasonable, particularly given the absence of any declaration by Alsabri himself that he did *not* make the initial request.

[8]Alsabri's counsel suggests that these admissions of his purpose to assist Taliban fighters may merely "have been the interrogators' gloss on what Alsabri said." Pet'r Br. 53. But as we have just noted, *supra* note 7, Alsabri never filed a declaration denying that he made the statements or suggesting they were untrue, and counsel's speculation is insufficient to render the district court's reliance on the statements unreasonable.

was "always armed." Interrogation Report at 6 (May 24, 2002) (J.A. 804).

Alsabri now maintains that he traveled to the front lines solely "out of curiosity and to visit a friend," Pet'r Br. 53, an explanation that the district court was entitled to discredit in light of his previous admissions. As the district court further noted, it is difficult to believe that "Taliban fighters would allow an individual to infiltrate their posts near a battle zone unless that person was understood to be a part of the Taliban." *Alsabri*, 764 F. Supp. 2d at 94 (internal quotation marks omitted).

In response to the latter point, Alsabri calls our attention "to an expert report explaining that there was a long history" of the Taliban permitting individuals who were not "member[s] of their forces (or of al-Qaida) to visit" the battle lines. Pet'r Br. 43-44. The expert described this kind of travel as a "jihad tour[]" for "so-called 'Gucci jihad[i]s.'" Decl. of Dr. Brian Williams ¶ 10 (Jan. 1, 2009) (J.A. 1496). But even if his expert's report is correct, Alsabri admits that *he* was never a "Gucci jihadi." *See* Pet'r Br. 44; Oral Arg. Recording at 17:45-17:50. Nor could he have claimed to be, given that Gucci jihadis -- as the name suggests -- were usually "wealthy (at least by Afghan standards)," Pet'r Br. 43, while Alsabri was indigent. Moreover, as the district court properly found, the fact that Alsabri sought and received authorization to travel to the battle lines from al-Ghamdi, a senior al Qaeda leader, indicates that he was not acting as an independent "freelancer," but rather as a part of the Taliban or al Qaeda. *Alsabri*, 764 F. Supp. 2d at 94; *cf. Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010).

E

Finally, although Alsabri does not specifically challenge it, the district court's further finding that he remained a part of the

Taliban or al Qaeda at the time of his capture, "just months" after he left the front lines, *Alsabri*, 764 F. Supp. 2d at 95, is also not clearly erroneous. Alsabri proffers no evidence that he took steps to dissociate himself from those groups in the months between his departure from the battle lines and his capture. Nor did the district court commit clear error in rejecting as implausible Alsabri's story concerning his whereabouts during that period: that he first went to Jalalabad, and then fled to a village near the Pakistan border, where he spent a month waiting patiently for a friend to return his passport. The district court reasonably concluded that it was "not credible" that Alsabri "would have waited a month in a hostile war zone simply to retrieve his passport, given that he had entered the country surreptitiously in the first place." *Id.* Alsabri's inability to recall the name of the village where he said he waited, despite his "demonstrated ability to recall specific details about names and locations" in other contexts, casts further doubt on that story. *Id.* Indeed, as the district court found, Alsabri's "descriptions of his time" in the period before his capture were "strikingly vague when compared to his accounts of other periods in Yemen and Afghanistan." *Id.* at 96. Moreover, he "provided no evidence that he established contacts with anyone in Afghanistan outside the Taliban/al–Qaida network, that he took any steps to obtain employment or that he took any other affirmative actions inconsistent with being 'part of' al-Qaida" or the Taliban. *Id.*

-----------------------

In sum, we discern no clear error in the district court's findings "that the petitioner traveled to Afghanistan to fight with the Taliban or al-Qaida, stayed at Taliban or al-Qaida guesthouses, received military training at [an] al-Qaida facility, traveled to the battle lines" of the Taliban's fight against the Northern Alliance, and did not "dissociate[ from] these enemy

forces at any point prior to his capture." 764 F. Supp. 2d at 96. And like the district court, we conclude that "[e]ven if none of these findings would independently justify his detention, viewed as a whole, they plainly establish that the petitioner was 'part of' the Taliban, al-Qaida or associated enemy" forces, so as to render his detention lawful under the AUMF. *Id.*[9]

## III

Alsabri also contends that the district court erred by considering two pieces of evidence over his objections: the DIA document the government offered to authenticate the 92-page collection of training records; and the text of a fatwa authored by Sheikh Hammoud al Aqla, one of the two Saudi religious scholars who issued the fatwa that Alsabri said influenced his decision to travel to Afghanistan. Pet'r Br. 30-37; *see Alsabri*, 764 F. Supp. 2d at 79-80, 90-91 & n.40. We review the district court's evidentiary decisions for abuse of discretion. *See Khan*, 655 F.3d at 25; *Al Alwi*, 653 F.3d at 15.

Alsabri objects to the district court's consideration of the DIA document on the ground that it was not in the record prior to the merits hearing. Rather, the government offered the document on rebuttal in response to Alsabri's challenge to the 92-page collection as unreliable. In permitting the government to respond, the district court did not abuse its "broad discretion in determining whether to admit or exclude rebuttal evidence." *United States v. Fench*, 470 F.2d 1234, 1239 (D.C. Cir. 1972). To the contrary, we have previously held it "proper[ to] afford[] the government an opportunity to submit 'sufficient additional

---

[9]By the same token, "we do not imply that all of the evidence in this case is *necessary* to find someone part of" al Qaeda or the Taliban; "we hold only that the evidence in this case is *sufficient*" for such a finding. *Uthman*, 637 F.3d at 407 n.8.

information . . . permit[ting the factfinder] to assess [the] reliability'" of a document that, "standing alone, lacked adequate indicia of reliability." *Khan*, 655 F.3d at 27 (quoting *Bensayah*, 610 F.3d at 725-26). Moreover, although Alsabri protests that he "had no meaningful opportunity to respond to the . . . document," Pet'r Br. 35, the district court told Alsabri's counsel that he would "have an opportunity to examine" the exhibit and that, "if something arises after you examine it that prompts you to believe that you should be heard or that the record should be supplemented, you will be permitted [to] do that," Hr'g Tr. at 39 (Nov. 15, 2010) (J.A. 754). Alsabri did not take advantage of that opportunity.[10]

Alsabri objects to the court's consideration of the fatwa on the ground that there was no evidence that the al Aqla fatwa that was read into the record was the same one that influenced his decision to travel to Afghanistan: the fatwa he read, he says, urged believers to go to Afghanistan "to assist" the Taliban, *Alsabri*, 764 F. Supp. 2d at 79 (quoting Interrogation Report at 5 (May 24, 2002) (J.A. 803)), while the one the government read into the record urged them "'to assist the Taliban Regime *and to make Jihad*,'" in a context indicating that the call was to take up arms in the Taliban's war against the Northern Alliance, *id.* (emphasis added) (quoting Gov't's Mot. for Judgment on the Record at 12-13 (June 4, 2010) (J.A. 297-98)).[11] Although the

---

[10]Although Alsabri also challenges the court's consideration of the document on the ground that it was never entered into evidence, Pet'r Br. 36 n.3, the record reveals otherwise, *see* Hr'g Tr. at 39 (Nov. 15, 2010) (J.A. 754).

[11]Alsabri also objects on the ground that the fatwa was not included as an exhibit to the government's factual return. Although this might have given the district court discretion to exclude it, the court's contrary decision was not an abuse of discretion because as early as June 2010, the government had provided Alsabri with a

district court acknowledged that the fatwa proffered by the government might not have been "the exact fatwa that influenced the petitioner," 764 F. Supp. 2d at 79, the court concluded that it was still probative because it was "written by the same cleric[] about the same conflict during roughly the same time period" and was consistent with al Aqla fatwas described by other detainees, *id.* at 80 n.30; *see id.* at 79 & n.28. Moreover, the court noted, "given the petitioner's documented awareness of the conflict in Afghanistan, it is not plausible that the petitioner could have understood the . . . call to 'assist the Taliban' as anything other than a call to take up arms." *Id.* at 80. In any event, even if the admission of the fatwa were error, it was harmless: the fatwa was plainly the least significant of at least four factors that amply support the court's finding that Alsabri traveled to Afghanistan for the purpose of fighting with the Taliban or al Qaeda. *See supra* Part II.A.[12]

---

translation of the fatwa's text and the archived internet address where it could be found. *See* Gov't's Mot. for Judgment on the Record at 12-13 (June 4, 2010) (J.A. 297-98).

[12]Alsabri further objects to the district court's reliance on statements by Humud Dakhil al-Jadani, another detainee at Guantanamo Bay, whom Alsabri characterizes as an "admitted liar." Pet'r Br. 27-28. But the court closely scrutinized al-Jadani's statements, relying only on those that were sufficiently corroborated by other evidence in the record. *See, e.g.*, *Alsabri*, 764 F. Supp. 2d at 79 n.28, 84 nn.34-35, 85 n.36. In any event, the only statements by al-Jadani that Alsabri contends should not have been admitted -- that the Haji Habash guesthouse was guarded by a Taliban guard and that the Islamic Institute was headed by a member of al Qaeda, *see* Pet'r Br. 27-28 -- are not seriously in dispute. Alsabri himself acknowledged that Haji Habash was a "Taliban guesthouse," *Alsabri*, 764 F. Supp. 2d at 83 (citing GTMO Intelligence Report at 2), and statements by another Guantanamo detainee who worked at the Islamic Institute confirm that the Institute was run by a senior al-

IV

Finally, Alsabri charges that the district court committed a number of legal errors that denied him a fair hearing.

First, he contends that the district court's Case Management Order placed improper limitations on his discovery from the government, an argument we rejected in the *Al Alwi*, *Al-Madhwani*, and *Bensayah* cases. *See Al Alwi*, 653 F.3d at 25-26; *Al-Madhwani*, 642 F.3d at 1077; *Bensayah*, 610 F.3d at 723-24. Second, he maintains that the court's admission of hearsay evidence, particularly reports of Alsabri's own statements, was error. We have repeatedly held, however, "that hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable." *Awad*, 608 F.3d at 7; *see Khan*, 655 F.3d at 26; *Al Alwi*, 653 F.3d at 19; *Barhoumi*, 609 F.3d at 422, 432-33; *Al-Bihani*, 590 F.3d at 879. The question of whether evidence is sufficiently reliable to credit is one we review for clear error, *Al Alwi*, 653 F.3d at 19, and Alsabri offers no grounds for finding clear error here, *see, e.g.*, *supra* notes 2, 12. Third, Alsabri maintains that the district court erred in applying a preponderance-of-the-evidence rather than clear-and-convincing-evidence standard. But it "'is now well-settled law that a preponderance of the evidence standard is constitutional in considering a habeas petition from an individual detained pursuant to authority granted by the AUMF.'" *Khan*, 655 F.3d at 26 (quoting *Al Odah*, 611 F.3d at 13); *see Almerfedi*, 654 F.3d

---

Qaeda leader, *see* Interrogation Report at 1 (Dec. 3, 2002) (J.A. 820); *see also Esmail*, 639 F.3d at 1076 (describing the Islamic Institute as "al Qaeda-affiliated").

at 5; *Al-Madhwani*, 642 F.3d at 1078; *Awad*, 608 F.3d at 10-11.[13]

As is apparent, all of Alsabri's legal arguments are foreclosed by Circuit precedent, a point his counsel forthrightly acknowledges. *See* Pet'r Br. 60 n.10. As is appropriate, counsel notes his disagreement with our rulings and includes the arguments in order to preserve the issues. *Id.*

V

For the foregoing reasons, we reject Alsabri's challenge to the district court's conclusion that he was "part of" the Taliban or al Qaeda. We therefore affirm the court's determination that Alsabri is lawfully detained pursuant to the AUMF.

*So ordered.*

---

[13]Alsabri also argues that the district court improperly shifted the preponderance burden from the government to him on two subsidiary factual issues, one involving the fatwa he saw in Yemen and the other involving the training documents that contained his kunya. Pet'r Br. 62. As was true in *Al-Bihani*, we believe this argument is "based on a strained reading" of the district court's decision. 590 F.3d at 881. The district court did not require Alsabri to prove anything. It simply found that the government's evidence on these matters was sufficient in the absence of any evidence to the contrary.